United States Court of Appeals
 for the district of columbia circuit
 

Argued June 29, 1998 Decided July 27, 1998

 No. 98-3060

 In re: Bruce R. Lindsey (Grand Jury Testimony)
 

Consolidated with
Nos. 98-3062 and 98-3072

Appeals from the United States District Court
for the District of Columbia
(No. 98ms00095)

 W. Neil Eggleston argued the cause for appellant the Office of the President, with whom
Timothy K. Armstrong, Julie K. Brof and Charles F.C. Ruff, Counsel to the President, were on
the briefs.

 David E. Kendall argued the cause for appellant William J. Clinton, with whom Nicole K.
Seligman, Max Stier, Robert S. Bennett, Carl S. Rauh, Amy Sabrin and Katharine S. Sexton were
on the briefs.

 Douglas N. Letter, Attorney, U.S. Department of Justice, argued the cause for amicus
curiae the Attorney General, with whom Janet Reno, Attorney General, Frank W. Hunger,
Assistant Attorney General, Stephen W. Preston, Deputy Assistant Attorney General, and
Stephanie R. Marcus, Attorney, were on the brief.

 Kenneth W. Starr, Independent Counsel and Brett M. Kavanaugh, Associate Independent
Counsel, argued the causes for appellee the United States, with whom Joseph M. Ditkoff,
Associate Independent Counsel, was on the brief.

 Before: Randolph, Rogers and Tatel, Circuit Judges.

 Opinion for the Court filed Per Curiam.

 Opinion dissenting from Part II and concurring in part and dissenting in part from Part III
filed by Circuit Judge Tatel.

 Per Curiam: In these expedited appeals, the principal question is whether an attorney in
the Office of the President, having been called before a federal grand jury, may refuse, on the
basis of a government attorney-client privilege, to answer questions about possible criminal
conduct by government officials and others. To state the question is to suggest the answer, for
the Office of the President is a part of the federal government, consisting of government
employees doing government business, and neither legal authority nor policy nor experience
suggests that a federal government entity can maintain the ordinary common law attorney-client
privilege to withhold information relating to a federal criminal offense. The Supreme Court and
this court have held that even the constitutionally based executive privilege for presidential
communications fundamental to the operation of the government can be overcome upon a proper
showing of need for the evidence in criminal trials and in grand jury proceedings. See United
States v. Nixon, 418 U.S. 683, 707-12 (1974); In re Sealed Case (Espy), 121 F.3d 729, 736-38
(D.C. Cir. 1997). In the context of federal criminal investigations and trials, there is no basis for
treating legal advice differently from any other advice the Office of the President receives in
performing its constitutional functions. The public interest in honest government and in
exposing wrongdoing by government officials, as well as the tradition and practice,
acknowledged by the Office of the President and by former White House Counsel, of government
lawyers reporting evidence of federal criminal offenses whenever such evidence comes to them,
lead to the conclusion that a government attorney may not invoke the attorney-client privilege in
response to grand jury questions seeking information relating to the possible commission of a
federal crime. The extent to which the communications of White House Counsel are privileged
against disclosure to a federal grand jury depends, therefore, on whether the communications
contain information of possible criminal offenses. Additional protection may flow from
executive privilege [[ 
 ]].
 I.
 On January 16, 1998, at the request of the Attorney General, the Division for the Purpose
of Appointing Independent Counsels issued an order expanding the prosecutorial jurisdiction of
Independent Counsel Kenneth W. Starr. Previously, the main focus of Independent Counsel
Starr's inquiry had been on financial transactions involving President Clinton when he was
Governor of Arkansas, known popularly as the Whitewater inquiry. The order now authorized
Starr to investigate "whether Monica Lewinsky or others suborned perjury, obstructed justice,
intimidated witnesses, or otherwise violated federal law" in connection with the civil lawsuit
against the President of the United States filed by Paula Jones. In re Motions of Dow Jones &
Co., 142 F.3d 496, 497-98 (D.C. Cir.), petition for cert. filed, 66 U.S.L.W. 3790 (U.S. June 3,
1998) (No. 97-1959) (quoting order). "Thereafter, a grand jury here began receiving evidence
about Monica Lewinsky and President Clinton, and others . . . . " Id. at 498.
 On January 30, 1998, the grand jury issued a subpoena to Bruce R. Lindsey, an attorney
admitted to practice in Arkansas. Lindsey currently holds two positions: Deputy White House
Counsel and Assistant to the President. On February 18, February 19, and March 12, 1998,
Lindsey appeared before the grand jury and declined to answer certain questions on the ground
that the questions represented information protected from disclosure by a government attorney-
client privilege applicable to Lindsey's communications with the President as Deputy White
House Counsel, as well as by executive privilege, and [[ ]]. 
Lindsey also claimed work product protections related to the attorney-client privilege[[ ]].
 On March 6, 1998, the Independent Counsel moved to compel Lindsey's testimony. The
district court granted that motion on May 4, 1998. The court concluded that the President's
executive privilege claim failed in light of the Independent Counsel's showing of need and
unavailability. See In re Sealed Case (Espy), 121 F.3d at 754. It rejected Lindsey's government
attorney-client privilege claim on similar grounds, ruling that the President possesses an attorney-
client privilege when consulting in his official capacity with White House Counsel, but that the
privilege is qualified in the grand jury context and may be overcome upon a sufficient showing of
need for the subpoenaed communications and unavailability from other sources. [[ 
 ]].
 [[ ]] the Office of the President [[ ]] appealed the order
granting the motion to compel Lindsey's testimony, challenging the district court's construction
of both the government attorney-client privilege and [[ ]]. The
Independent Counsel then petitioned the Supreme Court to review the district court's decision on
those issues, among others, before judgment by this court. On June 4, 1998, the Supreme Court
denied certiorari, while indicating its expectation that "the Court of Appeals will proceed
expeditiously to decide this case." United States v. Clinton, 118 S. Ct. 2079 (1998). Following
an expedited briefing schedule, on June 29, 1998, this court heard argument on the attorney-
client issues. Neither the Office of the President nor the President in his personal capacity has
appealed the district court's ruling on executive privilege. In Part II we address the availability
of the government attorney-client privilege; [[ ]].
 II.
 The attorney-client privilege protects confidential communications made between clients
and their attorneys when the communications are for the purpose of securing legal advice or
services. See In re Sealed Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984). It "is one of the oldest
recognized privileges for confidential communications." Swidler & Berlin v. United States, No.
97-1192, 1998 WL 333019, at *3 (U.S. June 25, 1998).
 The Office of the President contends that Lindsey's communications with the President
and others in the White House should fall within this privilege both because the President, like
any private person, needs to communicate fully and frankly with his legal advisors, and because
the current grand jury investigation may lead to impeachment proceedings, which would require
a defense of the President's official position as head of the executive branch of government,
presumably with the assistance of White House Counsel. The Independent Counsel contends
that an absolute government attorney-client privilege would be inconsistent with the proper role
of the government lawyer and that the President should rely only on his private lawyers for fully
confidential counsel.
 Federal courts are given the authority to recognize privilege claims by Rule 501 of the
Federal Rules of Evidence, which provides that
 [e]xcept as otherwise required by the Constitution of the United States or
 provided by Act of Congress or in rules prescribed by the Supreme Court pursuant
 to statutory authority, the privilege of a witness, person, government, State, or
 political subdivision thereof shall be governed by the principles of the common
 law as they may be interpreted by the courts of the United States in the light of
 reason and experience.

Fed. R. Evid. 501. Although Rule 501 manifests a congressional desire to provide the courts
with the flexibility to develop rules of privilege on a case-by-case basis, see Trammel v. United
States, 445 U.S. 40, 47 (1980), the Supreme Court has been "disinclined to exercise this authority
expansively," University of Pa. v. EEOC, 493 U.S. 182, 189 (1990). "[T]hese exceptions to the
demand for every man's evidence are not lightly created nor expansively construed, for they are
in derogation of the search for truth." Nixon, 418 U.S. at 710; see also Trammel, 445 U.S. at 50. 
Consequently, federal courts do not recognize evidentiary privileges unless doing so "promotes
sufficiently important interests to outweigh the need for probative evidence." Id. at 51.
 The Supreme Court has not articulated a precise test to apply to the recognition of a
privilege, but it has "placed considerable weight upon federal and state precedent," In re Sealed
Case (Secret Service), No. 98-3069, 1998 WL 370584, at *3 (D.C. Cir. July 7, 1998), and on the
existence of "a 'public good transcending the normally predominant principle of utilizing all
rational means for ascertaining the truth.'" Jaffee v. Redmond, 518 U.S. 1, 9 (1996) (quoting
Trammel, 445 U.S. at 50 (quoting Elkins v. United States, 364 U.S. 206, 234 (1960) (Frankfurter,
J., dissenting))). That public good should be shown "with a high degree of clarity and certainty." 
In re Sealed Case (Secret Service), 1998 WL 370584, at *4.
 A.
 Courts, commentators, and government lawyers have long recognized a government
attorney-client privilege in several contexts. Much of the law on this subject has developed in
litigation about exemption five of the Freedom of Information Act ("FOIA"). See 5 U.S.C.
 552(b)(5) (1994). Under that exemption, "intra-agency memorandums or letters which would
not be available by law to a party other than an agency in litigation with the agency" are excused
from mandatory disclosure to the public. Id.; see also S. Rep. No. 89-813, at 2 (1965) (including
within exemption five "documents which would come within the attorney-client privilege if
applied to private parties"). We have recognized that "Exemption 5 protects, as a general rule,
materials which would be protected under the attorney-client privilege." Coastal States Gas
Corp. v. Department of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980). "In the governmental
context, the 'client' may be the agency and the attorney may be an agency lawyer." Tax Analysts
v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997); see also Brinton v. Department of State, 636 F.2d
600, 603-04 (D.C. Cir. 1980). In Lindsey's case, his client -- to the extent he provided legal
services -- would be the Office of the President.
 Exemption five does not itself create a government attorney-client privilege. Rather,
"Congress intended that agencies should not lose the protection traditionally afforded through the
evidentiary privileges simply because of the passage of the FOIA." Coastal States, 617 F.2d at
862. In discussing the government attorney-client privilege applicable to exemption five, we
have mentioned the usual advantages:
 the attorney-client privilege has a proper role to play in exemption five cases. . . . 
 In order to ensure that a client receives the best possible legal advice, based on a
 full and frank discussion with his attorney, the attorney-client privilege assures
 him that confidential communications to his attorney will not be disclosed without
 his consent. We see no reason why this same protection should not be extended to
 an agency's communications with its attorneys under exemption five.

Mead Data Cent., Inc. v. United States Dep't of Air Force, 566 F.2d 242, 252 (D.C. Cir. 1977). 
Thus, when "the Government is dealing with its attorneys as would any private party seeking
advice to protect personal interests, and needs the same assurance of confidentiality so it will not
be deterred from full and frank communications with its counselors," exemption five applies. 
Coastal States, 617 F.2d at 863.
 Furthermore, the proposed (but never enacted) Federal Rules of Evidence concerning
privileges, to which courts have turned as evidence of common law practices, see, e.g., United
States v. Gillock, 445 U.S. 360, 367-68 (1980); In re Bieter Co., 16 F.3d 929, 935 (8th Cir.
1994); Linde Thomson Langworthy Kohn & Van Dyke v. Resolution Trust Corp., 5 F.3d 1508,
1514 (D.C. Cir. 1993); United States v. (Under Seal), 748 F.2d 871, 874 n.5 (4th Cir. 1984);
United States v. Mackey, 405 F. Supp. 854, 858 (E.D.N.Y. 1975), recognized a place for a
government attorney-client privilege. Proposed Rule 503 defined "client" for the purposes of the
attorney-client privilege to include "a person, public officer, or corporation, association, or other
organization or entity, either public or private." Proposed Fed. R. Evid. 503(a)(1), reprinted in56 F.R.D. 183, 235 (1972). The commentary to the proposed rule explained that "[t]he definition
of 'client' includes governmental bodies." Id. advisory committee's note. The Restatement also
extends attorney-client privilege to government entities. See Restatement (Third) of the Law
Governing Lawyers  124 (Proposed Final Draft No. 1, 1996) [hereinafter Restatement].
 The practice of attorneys in the executive branch reflects the common understanding that
a government attorney-client privilege functions in at least some contexts. The Office of Legal
Counsel in the Department of Justice concluded in 1982 that
 [a]lthough the attorney-client privilege traditionally has been recognized in the
 context of private attorney-client relationships, the privilege also functions to
 protect communications between government attorneys and client agencies or
 departments, as evidenced by its inclusion in the FOIA, much as it operates to
 protect attorney-client communications in the private sector.

Theodore B. Olsen, Assistant Attorney General, Office of Legal Counsel, Confidentiality of the
Attorney General's Communications in Counseling the President, 6 Op. Off. Legal Counsel 481,
495 (1982). The Office of Legal Counsel also concluded that when government attorneys stand
in the shoes of private counsel, representing federal employees sued in their individual capacities,
confidential communications between attorney and client are privileged. See Antonin Scalia,
Assistant Attorney General, Office of Legal Counsel, Disclosure of Confidential Information
Received by U.S. Attorney in the Course of Representing a Federal Employee (Nov. 30, 1976);
Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, Duty of Government
Lawyer Upon Receipt of Incriminating Information in the Course of an Attorney-Client
Relationship with Another Government Employee (Mar. 29, 1985); see also 28 C.F.R.
 50.15(a)(3) (1998).
 B.
 Recognizing that a government attorney-client privilege exists is one thing. Finding that
the Office of the President is entitled to assert it here is quite another.
 It is settled law that the party claiming the privilege bears the burden of proving that the
communications are protected. As oft-cited definitions of the privilege make clear, only
communications that seek "legal advice" from "a professional legal adviser in his capacity as
such" are protected. See 8 John Henry Wigmore, Evidence in Trials at Common Law 2292, at 554 (McNaughton rev. 1961). Or, in a formulation we have adopted, the privilege
applies only if the person to whom the communication was made is "a member of the bar of a
court" who "in connection with th[e] communication is acting as a lawyer" and the
communication was made "for the purpose of securing primarily either (i) an opinion on law or
(ii) legal services or (iii) assistance in some legal proceeding." In re Sealed Case, 737 F.2d at
98-99 (quoting United States v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D.
Mass. 1950)).
 On the record before us, it seems likely that at least some of the conversations for which
Lindsey asserted government attorney-client privilege did not come within the formulation just
quoted. [[ 

 ]]. Both of these subjects arose from the expanded jurisdiction of the Independent
Counsel, which did not become public until January 20, 1998. Before then, any legal advice
Lindsey rendered in connection with Jones v. Clinton, a lawsuit involving President Clinton in
his personal capacity, likely could not have been covered by government attorney-client
privilege. [[ 

 ]]. According to the Restatement, "consultation with one admitted to the bar but not in that
other person's role as lawyer is not protected." Restatement  122 cmt. c. "[W]here one
consults an attorney not as a lawyer but as a friend or as a business adviser or banker, or
negotiator . . . the consultation is not professional nor the statement privileged." 1 McCormick
on Evidence  88, at 322-24 (4th ed. 1992) (footnotes omitted). Thus Lindsey's advice on
political, strategic, or policy issues, valuable as it may have been, would not be shielded from
disclosure by the attorney-client privilege.
 As for conversations after January 20th, the Office of the President must "present the
underlying facts demonstrating the existence of the privilege" in order to carry its burden. See
FTC v. Shaffner, 626 F.2d 32, 37 (7th Cir. 1980). A blanket assertion of the privilege will not
suffice. Rather, "[t]he proponent must conclusively prove each element of the privilege." SEC v.
Gulf & Western Indus., 518 F. Supp. 675, 682 (D.D.C. 1981). In response to the Independent
Counsel's questions, Lindsey invariably asserted executive privilege and attorney-client
privilege. On this record, it is impossible to determine whether Lindsey believed that both
privileges applied or whether he meant to invoke them on an "either/or" basis. As we have said,
the district court's rejection of the executive privilege claim has not been appealed. With this
privilege out of the picture, the Office of the President had to show that Lindsey's conversations
"concerned the seeking of legal advice" and were between President Clinton and Lindsey or
between others in the White House and Lindsey while Lindsey was "acting in his professional
capacity" as an attorney. Shaffner, 626 F.2d at 37.
 With regard to most of the communications that were the subject of questions before the
grand jury, it does not appear to us that any such showing was made in the grand jury by Lindsey
or in the district court by the Office of the President in the proceedings leading to the order to
compel his testimony. This may be attributable to the parties' focus in the district court. The
arguments on both sides centered on whether any attorney-client privilege protected the
conversations about which Lindsey was asked, not on whether -- if the privilege could be
invoked -- the conversations were covered by it. In light of this, and in view of the
Administration's abandonment of its executive privilege claim, Lindsey would have to return to
the grand jury no matter how we ruled on the government attorney-client privilege claim.
 There is, however, no good reason for withholding decision on the issues now before us. 
We have little doubt that at least one of Lindsey's conversations subject to grand jury questioning
"concerned the seeking of legal advice" and was between President Clinton and Lindsey or
between others in the White House and Lindsey while Lindsey was "acting in his professional
capacity" as an attorney. See id. [[ 

 ]]. The issue whether the government attorney-client privilege
could be invoked in these circumstances is therefore ripe for decision.
 Moreover, the case has been fully briefed and argued. The Supreme Court has asked us
to expedite our disposition of these appeals. Sending this case back for still another round of
grand jury testimony, assertions of privileges and immunities, a district court judgment, and then
another appeal would be inconsistent with the Supreme Court's request and would do nothing but
prolong the grand jury's investigation. The parties, we believe, are entitled now to a ruling to
govern Lindsey's future grand jury appearance.
 We therefore turn to the question whether an attorney-client privilege permits a
government lawyer to withhold from a grand jury information relating to the commission of
possible crimes by government officials and others. Although the cases decided under FOIA
recognize a government attorney-client privilege that is rather absolute in civil litigation, those
cases do not necessarily control the application of the privilege here. The grand jury, a
constitutional body established in the Bill of Rights, "belongs to no branch of the institutional
Government, serving as a kind of buffer or referee between the Government and the people,"
United States v. Williams, 504 U.S. 36, 47 (1992), while the Independent Counsel is by statute an
officer of the executive branch representing the United States. For matters within his
jurisdiction, the Independent Counsel acts in the role of the Attorney General as the country's
chief law enforcement officer. See 28 U.S.C.  594(a) (1994). Thus, although the traditional
privilege between attorneys and clients shields private relationships from inquiry in either civil
litigation or criminal prosecution, competing values arise when the Office of the President resists
demands for information from a federal grand jury and the nation's chief law enforcement
officer. As the drafters of the Restatement recognized, "More particularized rules may be
necessary where one agency of government claims the privilege in resisting a demand for
information by another. Such rules should take account of the complex considerations of
governmental structure, tradition, and regulation that are involved." Restatement  124 cmt. b. 
For these reasons, others have agreed that such "considerations" counsel against "expansion of
the privilege to all governmental entities" in all cases. 24 Charles Alan Wright & Kenneth
W. Graham, Jr., Federal Practice and Procedure  5475, at 125 (1986).
 The question whether a government attorney-client privilege applies in the federal grand
jury context is one of first impression in this circuit, and the parties dispute the import of the lack
of binding authority. The Office of the President contends that, upon recognizing a government
attorney-client privilege, the court should find an exception in the grand jury context only if
practice and policy require. To the contrary, the Independent Counsel contends, in essence, that
the justification for any extension of a government attorney-client privilege to this context needs
to be clear. These differences in approach are not simply semantical: they represent different
versions of what is the status quo. To argue about an "exception" presupposes that the privilege
otherwise applies in the federal grand jury context; to argue about an "extension" presupposes the
opposite. In Swidler & Berlin, the Supreme Court considered whether, as the Independent
Counsel contended, it should create an exception to the personal attorney-client privilege
allowing disclosure of confidences after the client's death. See Swidler & Berlin, 1998 WL
333019, at *2. After finding that the Independent Counsel was asking the Court "not simply to
'construe' the privilege, but to narrow it, contrary to the weight of the existing body of caselaw,"
the Court concluded that the Independent Counsel had not made a sufficient showing to warrant
the creation of such an exception to the settled rule. Id. at *7.
 In the instant case, by contrast, there is no such existing body of caselaw upon which to
rely and no clear principle that the government attorney-client privilege has as broad a scope as
its personal counterpart. Because the "attorney-client privilege must be 'strictly confined within
the narrowest possible limits consistent with the logic of its principle,'" In re Sealed Case, 676
F.2d 793, 807 n.44 (D.C. Cir. 1982) (quoting In re Grand Jury Investigation, 599 F.2d 1224,
1235 (3d Cir. 1979)); accord Trammel, 445 U.S. at 50, and because the government attorney-
client privilege is not recognized in the same way as the personal attorney-client privilege
addressed in Swidler & Berlin, we believe this case poses the question whether, in the first
instance, the privilege extends as far as the Office of the President would like. In other words,
pursuant to our authority and duty under Rule 501 of the Federal Rules of Evidence to interpret
privileges "in light of reason and experience," Fed. R. Evid. 501, we view our exercise as one in
defining the particular contours of the government attorney-client privilege.
 When an executive branch attorney is called before a federal grand jury to give evidence
about alleged crimes within the executive branch, reason and experience, duty, and tradition
dictate that the attorney shall provide that evidence. With respect to investigations of federal
criminal offenses, and especially offenses committed by those in government, government
attorneys stand in a far different position from members of the private bar. Their duty is not to
defend clients against criminal charges and it is not to protect wrongdoers from public exposure. 
The constitutional responsibility of the President, and all members of the Executive Branch, is to
"take Care that the Laws be faithfully executed." U.S. Const. art. II,  3. Investigation and
prosecution of federal crimes is one of the most important and essential functions within that
constitutional responsibility. Each of our Presidents has, in the words of the Constitution, sworn
that he "will faithfully execute the Office of President of the United States, and will to the best of
[his] Ability, preserve, protect and defend the Constitution of the United States." Id. art. II,  1,
cl. 8. And for more than two hundred years each officer of the Executive Branch has been bound
by oath or affirmation to do the same. See id. art. VI, cl. 3; see also 28 U.S.C.  544 (1994). 
This is a solemn undertaking, a binding of the person to the cause of constitutional government,
an expression of the individual's allegiance to the principles embodied in that document. Unlike
a private practitioner, the loyalties of a government lawyer therefore cannot and must not lie
solely with his or her client agency.
 The oath's significance is underscored by other evocations of the ethical duties of
government lawyers. The Professional Ethics Committee of the Federal Bar Association has
described the public trust of the federally employed lawyer as follows:
 [T]he government, over-all and in each of its parts, is responsible to the people in
 our democracy with its representative form of government. Each part of the
 government has the obligation of carrying out, in the public interest, its assigned
 responsibility in a manner consistent with the Constitution, and the applicable
 laws and regulations. In contrast, the private practitioner represents the client's
 personal or private interest. . . . [W]e do not suggest, however, that the public is
 the client as the client concept is usually understood. It is to say that the lawyer's
 employment requires him to observe in the performance of his professional
 responsibility the public interest sought to be served by the governmental
 organization of which he is a part.

Federal Bar Association Ethics Committee, The Government Client and Confidentiality: Opinion
73-1, 32 Fed. B.J. 71, 72 (1973). Indeed, before an attorney in the Justice Department can step
into the shoes of private counsel to represent a federal employee sued in his or her individual
capacity, the Attorney General must determine whether the representation would be in the
interest of the United States. See 28 C.F.R.  50.15(a). The obligation of a government lawyer
to uphold the public trust reposed in him or her strongly militates against allowing the client
agency to invoke a privilege to prevent the lawyer from providing evidence of the possible
commission of criminal offenses within the government. As Judge Weinstein put it, "[i]f there is
wrongdoing in government, it must be exposed. . . . [The government lawyer's] duty to the
people, the law, and his own conscience requires disclosure . . . . " Jack B. Weinstein, Some
Ethical and Political Problems of a Government Attorney, 18 Maine L. Rev. 155, 160 (1966).
 This view of the proper allegiance of the government lawyer is complemented by the
public's interest in uncovering illegality among its elected and appointed officials. While the
President's constitutionally established role as superintendent of law enforcement provides one
protection against wrongdoing by federal government officials, see United States v. Valenzuela-
Bernal, 458 U.S. 858, 863 (1982), another protection of the public interest is through having
transparent and accountable government. As James Madison observed,
 [a] popular Government, without popular information, or the means of acquiring
 it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will
 forever govern ignorance: And a people who mean to be their own Governors,
 must arm themselves with the power which knowledge gives.

Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 The Writings of James
Madison 103 (Gaillard Hunt ed., 1910). This court has accordingly recognized that "openness
in government has always been thought crucial to ensuring that the people remain in control of
their government." In re Sealed Case (Espy), 121 F.3d at 749. Privileges work against these
interests because their recognition "creates the risk that a broad array of materials in many areas
of the executive branch will become 'sequester[ed]' from public view." Id. (quoting Wolfe v.
Department of Health & Human Servs., 815 F.2d 1527, 1533 (D.C. Cir. 1987)). Furthermore,
"to allow any part of the federal government to use its in-house attorneys as a shield against the
production of information relevant to a federal criminal investigation would represent a gross
misuse of public assets." In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 921 (8th
Cir.), cert. denied, 117 S. Ct. 2482 (1997).
 Examination of the practice of government attorneys further supports the conclusion that
a government attorney, even one holding the title Deputy White House Counsel, may not assert
an attorney-client privilege before a federal grand jury if communications with the client contain
information pertinent to possible criminal violations. The Office of the President has
traditionally adhered to the precepts of 28 U.S.C.  535(b), which provides that
 [a]ny information . . . received in a department or agency of the executive branch
 of the Government relating to violations of title 18 involving Government officers
 and employees shall be expeditiously reported to the Attorney General.
28 U.S.C.  535(b) (1994). We need not decide whether section 535(b) alone requires White
House Counsel to testify before a grand jury. The statute does not clearly apply to the Office of
the President. The Office is neither a "department," as that term is defined by the statute, see 5
U.S.C.  101 (1994); 28 U.S.C.  451 (1994); Haddon v. Walters, 43 F.3d 1488, 1490 (D.C. Cir.
1995) (per curiam), nor an "agency," see Kissinger v. Reporters Comm. for Freedom of the
Press, 445 U.S. 136, 156 (1980) (FOIA case); see also Armstrong v. Executive Office of the
President, 1 F.3d 1274, 1295 (D.C. Cir. 1993) (per curiam); National Sec. Archive v. Archivist of
the United States, 909 F.2d 541, 545 (D.C. Cir. 1990) (per curiam). However, at the very least
"[section] 535(b) evinces a strong congressional policy that executive branch employees must
report information" relating to violations of Title 18, the federal criminal code. In re Sealed
Case (Secret Service), 1998 WL 370584, at *7. As the House Committee Report accompanying
section 535 explains, "[t]he purpose" of the provision is to "require the reporting by the
departments and agencies of the executive branch to the Attorney General of information coming
to their attention concerning any alleged irregularities on the part of officers and employees of
the Government." H.R. Rep. No. 83-2622, at 1 (1954). Section 535(b) suggests that all
government employees, including lawyers, are duty-bound not to withhold evidence of federal
crimes.
 Furthermore, government officials holding top legal positions have concluded, in light of
section 535(b), that White House lawyers cannot keep evidence of crimes committed by
government officials to themselves. In a speech delivered after the Kissinger FOIA case was
handed down, Lloyd Cutler, who served as White House Counsel in the Carter and Clinton
Administrations, discussed the "rule of making it your duty, if you're a Government official as
we as lawyers are, a statutory duty to report to the Attorney General any evidence you run into of
a possible violation of a criminal statute." Lloyd N. Cutler, The Role of the Counsel to the
President of the United States, 35 Record of the Ass'n of the Bar of the City of New YorkNo. 8, at 470, 472 (1980). Accordingly, "[w]hen you hear of a charge and you talk to someone in
the White House . . . about some allegation of misconduct, almost the first thing you have to say
is, 'I really want to know about this, but anything you tell me I'll have to report to the Attorney
General.'" Id. Similarly, during the Nixon administration, Solicitor General Robert H. Bork told
an administration official who invited him to join the President's legal defense team: "A
government attorney is sworn to uphold the Constitution. If I come across evidence that is bad
for the President, I'll have to turn it over. I won't be able to sit on it like a private defense
attorney." A Conversation with Robert Bork, D.C. Bar Rep., Dec. 1997-Jan. 1998, at 9.
 The Clinton Administration itself endorsed this view as recently as a year ago. In the
proceedings leading to the Supreme Court's denial of certiorari with regard to the Eighth
Circuit's decision in In re Grand Jury Subpoena Duces Tecum, the Office of the President
assured the Supreme Court that it "embraces the principles embodied in Section 535(b)" and
acknowledged that "the Office of the President has a duty, recognized in official policy and
practice, to turn over evidence of the crime." Reply Brief for Office of the President at 7, Office
of the President v. Office of Independent Counsel, 117 S. Ct. 2482 (1997) (No. 96-1783). The
Office of the President further represented that "on various occasions" it had "referred
information to the Attorney General reflecting the possible commission of a criminal offense --
including information otherwise protected by attorney-client privilege." Id. At oral argument,
counsel for the Office of the President reiterated this position. In addition, the White House
report on possible misdeeds relating to the White House Travel Office stated that "[i]f there is a
reasonable suspicion of a crime . . . about which White House personnel may have knowledge,
the initial communication of this information should be made to the Attorney General, the
Deputy Attorney General, or the Associate Attorney General." White House Travel Office
Management Review 23 (1993).
 We are not aware of any previous deviation from this understanding of the role of
government counsel. We know that Nixon White House Counsel Fred Buzhardt testified before
the Watergate grand jury without invoking attorney-client privilege, although not much may be
made of this. See Anthony Ripley, Milk Producers' Group Fined $5,000 for Nixon Gifts, N.Y.
Times, May 7, 1974, at 38. On the other hand, the Office of the President points out that C.
Boyden Gray, White House Counsel during the Bush Administration, and his deputy, John
Schmitz, refused to be interviewed by the Independent Counsel investigating the Iran-Contra
affair and only produced documents subject to an agreement that "any privilege against
disclosure . . . including the attorney-client privilege" was not waived. 1 Lawrence E. Walsh,
Final Report of the Independent Counsel for Iran/Contra Matters 478-79 & n.52
(1993). However, the Independent Counsel in that investigation had not subpoenaed Gray or
Schmitz to testify before a grand jury, and there is no indication that the information sought from
them constituted evidence of any criminal offense. Independent Counsel Walsh apparently
sought to question these individuals merely to complete his final report. See id. In any event,
even outside the grand jury context, the general practice of government counsel has been to
cooperate with the investigations of independent counsels. For example, Peter Wallison, White
House Counsel under President Reagan, produced his diary for the Iran-Contra investigation and
cooperated in other ways. See id. at 44, 470 n.137, 517, 520. Other government attorneys both
produced documents and agreed to be interviewed for that investigation. See id. at 346-48, 366-
68, 536 & nn.116-17, 537.
 The Office of the President asserts two principal contributions to the public good that
would come from a government attorney's withholding evidence from a grand jury on the basis
of an attorney-client privilege. First, it maintains that the values of candor and frank
communications that the privilege embodies in every context would apply to Lindsey's
communications with the President and others in the White House. Government officials, the
Office of the President claims, need accurate advice from government attorneys as much as
private individuals do, but they will be inclined to discuss their legal problems honestly with
their attorneys only if they know that their communications will be confidential.
 We may assume that if the government attorney-client privilege does not apply in certain
contexts this may chill some communications between government officials and government
lawyers. Even so, government officials will still enjoy the benefit of fully confidential
communications with their attorneys unless the communications reveal information relating to
possible criminal wrongdoing. And although the privacy of these communications may not be
absolute before the grand jury, the Supreme Court has not been troubled by the potential chill on
executive communications due to the qualified nature of executive privilege. Compare Nixon,
418 U.S. at 712-13 (discounting the chilling effects of the qualification of the presidential
communications privilege on the candor of conversations), with Swidler & Berlin, 1998 WL
333019, at *6 (stating, in the personal attorney-client privilege context, that an uncertain
privilege is often no better than no privilege at all). Because both the Deputy White House
Counsel and the Independent Counsel occupy positions within the federal government, their
situation is somewhat comparable to that of corporate officers who seek to keep their
communications with company attorneys confidential from each other and from the shareholders. 
Under the widely followed doctrine announced in Garner v. Wolfinbarger, 430 F.2d 1093 (5th
Cir. 1970), corporate officers are not always entitled to assert such privileges against interests
within the corporation, and accordingly must consult with company attorneys aware that their
communications may not be kept confidential from shareholders in litigation. See id. at 1101. 
Any chill on candid communications with government counsel flowing from our decision not to
extend an absolute attorney-client privilege to the grand jury context is both comparable and
similarly acceptable.
 Moreover, nothing prevents government officials who seek completely confidential
communications with attorneys from consulting personal counsel. The President has retained
several private lawyers, and he is entitled to engage in the completely confidential
communications with those lawyers befitting an attorney and a client in a private relationship. [[ 
 ]]
 The Office of the President contends that White House Counsel's role in preparing for
any future impeachment proceedings alters the policy analysis. The Ethics in Government Act
requires the Independent Counsel to "advise the House of Representatives of any substantial and
credible information . . . that may constitute grounds for an impeachment." 28 U.S.C.  595(c)
(1994). In November 1997, a Congressman introduced a resolution in the House of
Representatives calling for an inquiry into possible grounds for impeachment of the President. 
See H.R. Res. 304, 105th Cong. (1997). Thus, to the extent that impeachment proceedings may
be on the horizon, the Office of the President contends that White House Counsel must be given
maximum protection against grand jury inquiries regarding their efforts to protect the Office of
the President, and the President in his personal capacity, against impeachment. Additionally, the
Office of the President notes that the Independent Counsel serves as a conduit to Congress for
information concerning grounds for impeachment obtained by the grand jury, and, consequently,
an exception to the attorney-client privilege before the grand jury will effectively abrogate any
absolute privilege those communications might otherwise enjoy in future congressional
investigations and impeachment hearings. 
 Although the Independent Counsel and the Office of the President agree that White
House Counsel can represent the President in the impeachment process, the precise contours of
Counsel's role are far from settled. In any event, no matter what the role should be,
impeachment is fundamentally a political exercise. See The Federalist No. 65 (Alexander
Hamilton); Joseph Story, Commentaries on the Constitution  764, at 559 (5th ed. 1905). 
Impeachment proceedings in the House of Representatives cannot be analogized to traditional
legal processes and even the procedures used by the Senate in "trying" an impeachment may not
be like those in a judicial trial. See (Walter) Nixon v. United States, 506 U.S. 224, 228-31
(1993); Story, Commentaries on the Constitution  765, at 559-60. How the policy and
practice supporting the common law attorney-client privilege would apply in such a political
context thus is uncertain. In preparing for the eventuality of impeachment proceedings, a White
House Counsel in effect serves the President as a political advisor, albeit one with legal
expertise: to wit, Lindsey occupies a dual position as an Assistant to the President and a Deputy
White House Counsel. Thus, information gathered in preparation for impeachment proceedings
and conversations regarding strategy are presumably covered by executive, not attorney-client,
privilege. While the need for secrecy might arguably be greater under these circumstances, the
district court's ruling on executive privilege is not before us. In addition, in responding to the
grand jury investigation and gathering information in preparation for future developments in
accordance with his official duties, White House Counsel may need to interact with the
President's private attorneys, and to that extent other privileges may be implicated. [[ ]]
 Nor is our conclusion altered by the Office of the President's concern over the possibility
that Independent Counsel will convey otherwise privileged grand jury testimony of White House
Counsel to Congress. Cf. Fed. R. Crim. P. 6(e). First, no one can say with certainty the extent
to which a privilege would generally protect a White House Counsel from testifying at a
congressional hearing. The issue is not presently before the court. See Nixon, 418 U.S. at 712
n.19; In re Sealed Case (Espy), 121 F.3d at 739 nn.9-10, 753. Second, the particular procedures
and evidentiary rules to be employed by the House and Senate in any future impeachment
proceedings remain entirely speculative. Finally, whether Congress can abrogate otherwise
recognized privileges in the course of impeachment proceedings may well constitute a
nonjusticiable political question. See (Walter) Nixon, 506 U.S. at 236.
 The Supreme Court's recognition in United States v. Nixon of a qualified privilege for
executive communications severely undercuts the argument of the Office of the President
regarding the scope of the government attorney-client privilege. A President often has private
conversations with his Vice President or his Cabinet Secretaries or other members of the
Administration who are not lawyers or who are lawyers, but are not providing legal services. 
The advice these officials give the President is of vital importance to the security and prosperity
of the nation, and to the President's discharge of his constitutional duties. Yet upon a proper
showing, such conversations must be revealed in federal criminal proceedings. See Nixon, 418
U.S. at 713; In re Sealed Case (Espy), 121 F.3d at 745. Only a certain conceit among those
admitted to the bar could explain why legal advice should be on a higher plane than advice about
policy, or politics, or why a President's conversation with the most junior lawyer in the White
House Counsel's Office is deserving of more protection from disclosure in a grand jury
investigation than a President's discussions with his Vice President or a Cabinet Secretary. In
short, we do not believe that lawyers are more important to the operations of government than all
other officials, or that the advice lawyers render is more crucial to the functioning of the
Presidency than the advice coming from all other quarters.
 The district court held that a government attorney-client privilege existed and was
applicable to grand jury proceedings, but could be overcome, as could an applicable executive
privilege, upon a showing of need and unavailability elsewhere by the Independent Counsel. 
While we conclude that an attorney-client privilege may not be asserted by Lindsey to avoid
responding to the grand jury if he possesses information relating to possible criminal violations,
he continues to be covered by the executive privilege to the same extent as the President's other
advisers. Our analysis, in addition to having the advantages mentioned above, avoids the
application of balancing tests to the attorney-client privilege -- a practice recently criticized by
the Supreme Court. See Swidler & Berlin, 1998 WL 333019, at *6.
 In sum, it would be contrary to tradition, common understanding, and our governmental
system for the attorney-client privilege to attach to White House Counsel in the same manner as
private counsel. When government attorneys learn, through communications with their clients,
of information related to criminal misconduct, they may not rely on the government attorney-
client privilege to shield such information from disclosure to a grand jury.

 III. [[ 

 
 ]].
 IV.
 Accordingly, for the reasons stated in this opinion, we affirm [[ ]].
 In accordance with the Supreme Court's expectation that "the Court of Appeals will
proceed expeditiously to decide this case," Clinton, 118 S. Ct. at 2079, any petition for rehearing
or suggestion for rehearing in banc shall be filed within seven days after the date of this decision.
 It is so ordered. 
 Tatel, Circuit Judge, dissenting from Part II and concurring in part and dissenting in part
from Part III. The attorney-client privilege protects confidential communication between clients
and their lawyers, whether those lawyers work for the private sector or for government. Although I
have no doubt that government lawyers working in executive departments and agencies enjoy a
reduced privilege in the face of grand jury subpoenas, I remain unconvinced that either "reason" or
"experience" (the tools of Rule 501) justifies this court's abrogation of the attorney-client privilege
for lawyers serving the Presidency. This court's far-reaching ruling, moreover, may have been
unnecessary to give this grand jury access to Bruce Lindsey's communications with the President,
for on this record it is not clear whether those communications involved official legal advice that
would be protected by the attorney-client privilege. Before limiting the attorney-client privilege
not just for this President, but for all Presidents to come, the court should have first remanded this
case to the district court to recall Lindsey to the grand jury to determine the precise nature of his
communications with the President. 
 I
 My colleagues and I have no disagreement concerning personal legal advice Lindsey may
have given the President. We agree, and the White House concedes, that the official
attorney-client privilege does not protect such communications, for as a White House employee
Lindsey had no authority to provide such advice. Nor do we disagree about political advice given
to the President by advisers who happen to be lawyers. Such advice is protected, if at all, by the
executive privilege alone. Our disagreement centers solely on whether a grand jury can pierce the
attorney-client privilege with respect to official legal advice that the Office of White House
Counsel gives a sitting President. 
 One of the oldest privileges at common law and "'rooted in the imperative need for
confidence and trust,'" Jaffee v. Redmond, 518 U.S. 1, 10 (1996) (quoting Trammel v. United
States, 445 U.S. 40, 51 (1980)), the attorney-client privilege "encourage[s] 'full and frank
communication between attorneys and their clients, and thereby promote[s] broader public interests
in the observance of law and the administration of justice.'" Swidler & Berlin v. United States, No.
97-1192, 1998 WL 333019, at *3 (U.S. June 25, 1998) (quoting Upjohn Co. v. United States, 449
U.S. 383, 389 (1981)). The privilege protects client confidences even in the face of grand jury
subpoenas. See id. at *2, *7. 
 Government attorneys enjoy the attorney-client privilege in order to provide reliable legal
advice to their governmental clients. "Unless applicable law otherwise provides, the attorney-
client privilege extends to a communication of a governmental organization . . . and of an
individual officer . . . of a governmental organization." Restatement (Third) of the Law
Governing Lawyers ("Restatement")  124 (Proposed Final Draft No. 1, 1996); see alsoProposed Fed. R. Evid. 503(a)(1), reprinted in 56 F.R.D. 183, 235 (1972). We have explained
that where "the Government is dealing with its attorneys as would any private party seeking advice
to protect personal interests, [it] needs the same assurance of confidentiality so it will not be
deterred from full and frank communications with its counselors." Coastal States Gas Corp. v.
Department of Energy, 617 F.2d 854, 863 (D.C. Cir. 1980); see also Tax Analysts v. IRS, 117 F.3d
607, 620 (D.C. Cir. 1997) ("Communications revealing . . . client confidences [between IRS field
personnel and IRS counsel regarding audit activity] . . . are clearly covered by the attorney-client
privilege . . . .").
 This court now holds that for all government attorneys, including those advising a
President, the attorney-client privilege dissolves in the face of a grand jury subpoena. According to
the court, its new rule "avoids the application of balancing tests to the attorney-client privilege a
practice recently criticized by the Supreme Court." Maj. Op. at 26. But whether a court abrogates
the privilege by applying the balancing test rejected in Swidler, or by the rule the court adopts
today, the chilling effect is precisely the same. Clients, in this case Presidents of the United States,
will avoid confiding in their lawyers because they can never know whether the information they
share, no matter how innocent, might some day become "pertinent to possible criminal violations,"
id. at 18. Rarely will White House counsel possess cold, hard facts about presidential wrongdoing
that would create a strong public interest in disclosure, yet the very possibility that the confidence
will be breached will chill communications. See Swidler, 1998 WL 333019, at *5-6. As a result,
Presidents may well shift their trust on all but the most routine legal matters from White House
counsel, who undertake to serve the Presidency, to private counsel who represent its occupant. 
 Unlike Jaffee, 518 U.S. at 10-11 (recognizing a federal psychotherapy privilege), and In re
Sealed Case, No. 98-3069, 1998 WL 370584, at *4 (D.C. Cir. July 7, 1998) (declining to
recognize a protective function privilege for Secret Service agents), this case involves not the
creation of a new privilege, but as in Swidler, the carving out of an exception to an already well-
established privilege. See Swidler, 1998 WL 333019, at *6. Denying that they are creating an
exception, my colleagues say that they are "defining the particular contours of the government
attorney-client privilege," Maj. Op. at 14, but no court has suggested that the attorney-client
privilege must be extended client by client to each new governmental entity, proceeding by
proceeding. Rather, "[u]nless applicable law otherwise provides," Restatement  124, the
privilege applies to all attorneys and all clients, regardless of their identities or the nature of the
proceeding, see Swidler, 1998 WL 333019, at *6 (finding no case authority for civil-criminal
distinction). The question before us, then, is whether either "reason" or "experience" (Fed. R.
Evid. 501), calls for exempting the Presidency from the traditional attorney-client relationship
that all clients enjoy with their lawyers. See, e.g., Trammel, 445 U.S. at 48, 52 (curtailing spousal
privilege based on majority trend in state law, the disappearance of "ancient" notions of the
subordinate status of women, and the unpersuasiveness of arguments regarding privilege's effect
on marital stability). 
 As one of its reasons for abrogating the presidential attorney-client privilege, the court
says that legal advice is no different from the advice a President receives from other advisers,
advice protected only by executive privilege. Maj. Op. at 25-26. I think the court seriously
underestimates the independent role and value of the attorney-client privilege. Unlike the
executive privilege a broad, constitutionally derived privilege that protects frank debate between
President and advisers, see United States v. Nixon, 418 U.S. 683, 708 (1974); In re Sealed Case,
121 F.3d 729, 742-46 (D.C. Cir. 1997) the narrower attorney-client privilege flows not from the
Constitution, but from the common law, see Swidler, 1998 WL 333019, at *7. The attorney-client
privilege does not protect general policy or political advice even when given by lawyers but
only communications with lawyers "for the purpose of obtaining legal assistance." Restatement 122. Necessitated by the nature of the lawyer's function, the attorney-client privilege enables
the lawyer as an officer of the court properly to advise the client, including facilitating compliance
with the law. See Upjohn, 449 U.S. at 389. In other words, the unique protection the law affords
a President's communications with White House counsel rests not, as my colleagues put it, on
some "conceit" that "lawyers are more important to the operations of government than all other
officials," Maj. Op. at 26, but rather on the special nature of legal advice, and its special need for
confidentiality, as recognized by centuries of common law. It therefore makes sense that the
Presidency possesses both the attorney-client and executive privileges, and that courts treat them
differently.
 The court also cites 28 U.S.C.  535(b). Although that statute generally supports
qualifying though not abrogating the attorney-client privilege for government attorneys
working in executive departments and agencies, the court acknowledges, as the Attorney General
has told us in her amicus brief, that section 535(b) does not apply to the Office of the President. 
The court cites several statements, including former White House Counsel Lloyd Cutler's speech
to the New York Bar, the White House Travel Office Management Review, and the
Administration's certiorari petition in In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910
(8th Cir.), cert. denied, 117 S. Ct. 2482 (1997), indicating that White House lawyers comply with
the spirit of section 535(b). Maj. Op. at 19-20. Nothing in those statements suggests, however,
that their authors were referring to conversations between White House counsel and the President
of the United States, i.e., that one presidential subordinate (White House counsel) would report a
confidential conversation with a President to another presidential subordinate (the Attorney
General). The court points to no other statutory basis for denying the President the benefit of the
official privilege. Although the Independent Counsel statute ensures independent, aggressive
prosecution of wrongdoing, nothing in that statute disables a President from defending himself or
otherwise indicates that Congress intended to deprive the Presidency of its official privileges. 
 The court refers to actions of a few previous White House counsel: Fred Buzhardt
testified voluntarily before the Watergate grand jury; Peter Wallison turned over his diaries to the
Iran-Contra investigation; and C. Boyden Gray and his deputy refused to be interviewed by that
same Iran-Contra Independent Counsel. See Maj. Op. at 20-21. In my view, these limited and
contradictory examples reveal nothing about the standard we should apply where, as here, a
President of the United States actually invokes the attorney-client privilege in the face of a grand
jury subpoena. 
 Acknowledging the facial inapplicability of section 535(b) to the Office of the President,
the court relies on the government lawyer's oath of office for the proposition that White House
counsel cannot have a traditional attorney-client relationship with the President. But all lawyers,
whether they work within the government or the private sector, take an oath to uphold the
Constitution of the United States. In order to practice before this court, for example, attorneys
must promise to "demean [themselves] . . . according to law . . . [and] support the Constitution of
the United States." Application for Admission to Practice (U.S. Court of Appeals for the D.C.
Circuit). No one would suggest that this oath abrogates a client's privilege in the face of a grand
jury subpoena. 
 This court's opinion, moreover, nowhere accounts for the unique nature of the Presidency,
its unique need for confidential legal advice, or the possible consequences of abrogating the
attorney-client privilege for a President's ability to obtain such advice. Elected, head of the
Executive Branch, Commander-in-Chief, head of State, and removable only by impeachment, the
President is not just "a part of the federal government, consisting of government employees doing
government business." Maj. Op. at 2. As Justice Robert H. Jackson observed in the steel seizure
case, the Presidency concentrates executive authority "in a single head in whose choice the whole
Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude
and finality his decisions so far overshadow any others that almost alone he fills the public eye
and ear." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 653 (1952) (Jackson, J.,
concurring). Echoing Justice Jackson three decades later, the Supreme Court emphasized in
Nixon v. Fitzgerald, 457 U.S. 731 (1982), that the President "occupies a unique position in the
constitutional scheme," id. at 749, that we depend on the President for the "most sensitive and far-
reaching decisions entrusted to any official under our constitutional system," id. at 752, and that
the President's "unique status under the Constitution" distinguishes him from other executive
branch officials, id. at 750. The Attorney General, focusing on the President's "singular
responsibilities," describes the Presidency's critical need for legal advice as follows: 
 The Constitution vests the President with unique, and uniquely consequential,
 powers and responsibilities. The Nation's "executive Power" is vested in him
 alone. U.S. Const. Art. II,  1. In addition to his significant and diverse domestic
 and foreign affairs responsibilities, he is specifically required to adhere to and
 follow the law, both in his oath of office (Art. II,  1, Cl. 8) and in the requirement
 that "he shall take Care that the Laws be faithfully executed." Art. II,  3. To
 fulfill his manifold duties and functions, the President must have access to legal
 advice that is frank, fully informed, and confidential. Because of the magnitude of
 the Nation's interest in facilitating the President's conduct of his office in
 accordance with law, the President's pressing need for effective legal advice knows
 no parallel in government.

Amicus Br. at 24. By lumping the President together with tax collectors, passport application
processors, and all other executive branch employees even cabinet officers the court bypasses
the reasoned "case-by-case" analysis demanded by Rule 501, Jaffee, 518 U.S. at 8 (quoting S.
Rep. No. 93-1277, at 13 (1974)). 
 A President's need for confidential legal advice may "know[] no parallel in government"
for another reason. Because the Presidency is tied so tightly to the persona of its occupant, and
because of what Fitzgerald referred to as the Presidency's increased "vulnerability," stemming
from "the visibility of [the] office and the effect of [the President's] actions on countless people,"
Fitzgerald, 457 U.S. at 753, official matters proper subjects for White House counsel
consultation often have personal implications for a President. Since for any President the line
between official and personal can be both elusive and difficult to discern, I think Presidents need
their official attorney-client privilege to permit frank discussion not only of innocuous, routine
issues, but also sensitive, embarrassing, or even potentially criminal topics. The need for the
official presidential attorney-client privilege seems particularly strong after Watergate which,
while ushering in a new era of accountability and openness in the highest echelons of government,
also increased the Presidency's vulnerability. Aggressive press and congressional scrutiny, the
personalization of politics, and the enactment of the Independent Counsel statute, Pub. L. No. 95-
521, Tit. VI, 92 Stat. 1824, 1867 (1978) (codified as amended at 28 U.S.C.  591-599
(1994)) which triggers appointment of an Independent Counsel based on no more than the
existence of "reasonable grounds to believe that further investigation is warranted," 28 U.S.C. 
592(c)(1)(A) have combined to make the Supreme Court's fear that Presidents have become
easy "target[s]," Fitzgerald, 457 U.S. at 753, truer than ever. No President can navigate the
treacherous waters of post-Watergate government, make controversial official legal decisions,
decide whether to invoke official privileges, or even know when he might need private counsel,
without confidential legal advice. Because of the Presidency's enormous responsibilities,
moreover, the nation has compelling reasons to ensure that Presidents are well defended against
false or frivolous accusations that could interfere with their duties. The nation has equally
compelling reasons for ensuring that Presidents are well advised on whether charges are serious
enough to warrant private counsel. I doubt that White House counsel can perform any of these
functions without the candor made possible by the attorney-client privilege. As I said at the
outset, weakening the privilege may well cause Presidents to shift their trust from White House
lawyers who have undertaken to serve the Presidency, to private lawyers who have not. 
 Preserving the official presidential attorney-client privilege would not place the President
above the law, as the Independent Counsel implies. To begin with, by enabling clients including
Presidents to be candid with their lawyers and lawyers to advise clients confidentially, the
attorney-client privilege promotes compliance with the law. See Upjohn, 449 U.S. at 389. 
Independent Counsels, moreover, have powerful weapons to combat abuses of the attorney-client
privilege. If evidence suggested that a President used White House counsel to further a crime, the
crime-fraud exception would abrogate the privilege. See United States v. Zolin, 491 U.S. 554,
562-63 (1989). If an Independent Counsel had evidence that White House counsel's status as an
attorney was used to protect non-legal materials from disclosure, those materials would not be
protected. See State v. Philip Morris Inc., No. C1-94-8565, 1998 WL 257214, at *7 (Minn. Dist.
Ct. Mar. 7, 1998) (releasing documents as penalty for bad faith claim of privilege). "The privilege
takes flight," Justice Benjamin Cardozo said, "if the [attorney-client] relation is abused." Clark v.
United States, 289 U.S. 1, 15 (1933). Or if an Independent Counsel presented evidence that a
White House counsel committed a crime, a grand jury could indict that lawyer. See George
Lardner, Jr., Dean Guilty in Cover-Up: Nixon Ex-Aide Pleads to Count of Conspiracy, Wash.
Post, Oct. 20, 1973, at A1. This Independent Counsel has never alleged that any of these abuses
occurred. 
 To be sure, a properly exercised attorney-client privilege may deny a grand jury access to
information, see Swidler, 1998 WL 333019, at *6 (justifying the burden placed on the truth-
seeking function by the privilege), but Presidents remain accountable in other ways, see
Fitzgerald, 457 U.S. at 757 (checks on Presidential action include impeachment, press scrutiny,
congressional oversight, need to maintain prestige, and concern for historical stature). An
Independent Counsel, moreover, can always report to Congress that a President has denied critical
information to a grand jury. See 28 U.S.C.  595(a)(2), (c). If the President continues to exercise
his attorney-client privilege in the face of a congressional subpoena, and if Congress believes that
the President has committed "high Crimes and Misdemeanors," U.S. Const. art. II,  4, Congress
can always consider impeachment. See H. Rep. No. 93-1305, at 4, 187-213 (1974)
(recommending impeachment of President Nixon based on his refusal to turn over information in
response to congressional subpoenas).
 II
 During Lindsey's several grand jury appearances he invoked both executive and attorney-
client privileges, often with respect to the same questions. Now that the White House has
dropped the executive privilege issue, much of that information may be available to the
Independent Counsel and we have no way of knowing which questions, if any, Lindsey would
continue to decline to answer. Even more fundamental, Lindsey's affidavit, [[ ]] and the
affidavit of White House Counsel Charles F.C. Ruff suggest that the communications between
Lindsey and the President regarding the Monica Lewinsky and Paula Jones matters may have
involved political and policy discussions, not legal advice. To be sure, the affidavits [[ 
 ]] refer to advice about legal topics, such as invoking privileges and preparing for
impeachment. But nowhere do they demonstrate that Lindsey rendered that advice in his capacity
as a lawyer, i.e., that "the lawyer's professional skill and training would have value in the matter." 
Restatement  122 cmt. b. A conversation is not privileged merely because the President asked
Lindsey a question about a nominally legal matter or in his capacity as White House Counsel staff. 
For example, if Lindsey advised the President about the political implications of invoking
executive privilege, that communication would not be privileged; if he discussed the availability
of the privilege as a legal matter, the conversation would be protected. 
 Distinguishing between Lindsey's legal and non-legal advice becomes even more difficult
because not only does Lindsey wear two hats, one legal (Deputy White House Counsel) and one
non-legal (Special Assistant to the President), but the Office of White House Counsel has
historically performed many non-legal functions, such as giving policy advice, writing speeches,
and performing various political tasks. See Stephen Hess, Organizing the Presidency 36, 43,
84 (1988); Lloyd N. Cutler, The Role of the Counsel to the President of the United States, 35
Record of the Association of the Bar of the City of New York 470, 472-76 (1980);
Jeremy Rabkin, At the President's Side: The Role of the White House Counsel in Constitutional
Policy, Law & Contemp. Probs., Autumn 1993, at 63, 65-76. When an advisor serves dual
roles, the party invoking the privilege bears a particularly heavy burden of demonstrating that the
services provided were in fact legal. See, e.g., Texaco Puerto Rico, Inc. v. Department of
Consumer Affairs, 60 F.3d 867, 884 (1st Cir. 1995) (where agency "delegated policymaking
authority to its outside counsel to such an extent that counsel ceased to function as lawyers and
began to function as regulators," it could not invoke attorney-client privilege); Restatement 
122 cmt. c (whether privilege applies to lawyer acting in dual roles depends upon circumstances);
cf. In re Sealed Case, 121 F.3d at 752 (with respect to "'dual hat' presidential advisors, the
government bears the burden of proving that the communications" are covered by the executive
privilege).
 Accordingly, before abrogating the official attorney-client privilege for all future
Presidents, this court should have remanded to the district court to allow the Independent Counsel
to recall Lindsey to the grand jury to determine whether, with respect to each question that he
declines to answer, he can demonstrate the elements of the attorney-client privilege, namely that
each communication was made between privileged persons in confidence "for the purpose of
obtaining or providing legal assistance for the client," Restatement  118. See United States v.
Kovel, 296 F.2d 918, 923 (2nd Cir. 1961) (remanding to permit accountant witness to offer factual
support for assertion that communications were made in pursuit of legal advice). If Lindsey failed
to meet this burden, that would end the matter, leaving for another day the difficult question of
presidential attorney-client privilege, with its consequences for the functioning of the Presidency,
as well as its potential implications for possible impeachment proceedings (implications we have
hardly begun to consider). See Maj. Op. at 23-25; Office of the President Br. at 26-29; Office of
the Independent Counsel Br. at 35; cf. Amicus Br. at 34-37. On the other hand, if Lindsey
demonstrated that his communications involved official legal advice, the district court could use
the remand to enrich the record by, for example, inviting former White House counsel to describe
the nature of the relationship between Presidents and White House counsel generally and the role
of the attorney-client privilege in particular. This would create an infinitely more useful record
for us, or eventually the Supreme Court, to determine whether reason or experience justifies any
change in the official presidential attorney-client privilege, and if so, whether the privilege can be
modified without threatening a President's ability to "take Care that the Laws be faithfully
executed." U.S. Const. art. II,  3. See Swidler, 1998 WL 333019, at *6 n.4 (noting lack of
empirical evidence in support of limiting the privilege); Jaffee, 518 U.S. at 16 & n.16 (relying on
amicus briefs citing psychology and social work studies); Trammel, 445 U.S. at 48, 52 (relying on
historical developments regarding the role of women in marriage). 
 I do not consider the Supreme Court's expectation that we proceed expeditiously to be
inconsistent with our obligation to engage in fully reasoned and informed decision-making. The
importance to the Presidency of effective legal advice requires no less. Moreover, according to
the Independent Counsel, the grand jury is exploring whether obstruction of justice, perjury,
witness intimidation, and other crimes were committed in January 1998. See 18 U.S.C.  3282
(establishing five-year statute of limitations for non-capital federal crimes). We thus have time to
determine whether we need to resolve this important question and, if so, to ensure that we do so
on the basis of a fuller, more useful record. If the Independent Counsel needs to report to
Congress more expeditiously, he is free to do so.
 III
 [[

 ]]