**In re SEALED CASE.**

**Nos. 84–5065, 84–5087.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1984.

Decided June 15, 1984.

Before ROBINSON, Chief Judge, GINS-BURG, Circuit Judge, and EDMUND L. PALMIERI,* Senior United States District Judge for the Southern District of New York.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This is an expedited appeal from a district court order instructing an attorney to testify before a grand jury on matters the attorney's former client regards as privileged. Appellant is a corporation (hereafter, "the Company")[1] targeted for investigation by the grand jury. The witness whose testimony is at stake formerly served as the Company's vice president-general counsel, and sole in-house attorney. The Company instructed its former counsel to raise the attorney-client privilege regarding several grand jury inquiries. Former

counsel did so and the government moved to compel his testimony.

The district court granted the motion as to four conversations between the witness and the Company's president, and two "hunches" the witness entertained; it denied the motion as to one conversation between the witness and a Company senior executive. *In re Grand Jury Proceedings*, Misc. No. 83–00337 (D.D.C. Jan. 25, 1984) (hereafter "D.D.C. Memorandum and Order"). The Company seeks review of the district court's order to the extent that it grants the government's motion, and the government cross-appeals regarding the one conversation that the district court held privileged.

We hold first that the challenged order is subject to immediate appeal. On the merits of the cross-appeals, we affirm the district court's order as to one of the counsel to Company president communications (the report and ensuing exchange concerning information overheard at the O'Hare Hilton), counsel's two "hunches," and the conversation between the Company senior executive and counsel; we reverse and uphold the claim of privilege as to three of the conversations between counsel and the Company president.

## I. FACTS

The former vice president-general counsel whose grand jury testimony is at issue (hereafter, "C") was the Company's sole in-house attorney from 1976 until 1981. Joint Appendix (hereafter, "J.A.") 385. C was responsible for all Company legal affairs; he reported directly to the Company's president (hereafter, "P"). J.A. 213–14. P and other Company personnel informed C about virtually all Company business activities, and C used the information thus received to render legal advice on a

---

\* Sitting by designation pursuant to 28 U.S.C. § 294(e).

1. Because the case is under seal, we refer to all parties by generic names or letters of the alphabet.

daily basis to a wide variety of Company employees. J.A. 226–27.[2]

Prompting the grand jury investigation of Company activities, the Department of Justice received an anonymous letter in early 1982 addressed to the "Deputy Attorney General, Antitrust." J.A. 381–83. The letter listed, with some supporting detail, instances of alleged bid rigging on several major construction projects. C admits that he wrote the letter. J.A. 274.

In the course of the investigation, C appeared before the grand jury and testified at length about his activities and observations during his tenure with the Company. *See* J.A. 13–180. At certain "critical points," however, on instruction from the Company's current counsel, C asserted attorney-client privilege and refused to answer questions. *See* Brief for the Government at 9. C's refusal to answer related to five matters:

(1) A 1980 disclosure by C to P concerning a conversation C overheard at the O'Hare Hilton (J.A. 93–98);

(2) The bases for certain "hunches" C had regarding Company involvement in bid rigging (J.A. 64–70, 111–12, 119–22, 154–55, 159); [3]

(3) A 1978 or 1979 conversation between C and a Company senior executive at a St. Paul restaurant (J.A. 117–18, 168–70);

(4) Two 1979 or 1980 conversations between C and P in P's office in the course of periodic status reviews of, the Company's legal affairs (J.A. 103–06);

(5) A 1978 conversation between C and P aboard an airplane (J.A. 129–41).

In response to the government's motion to compel C's testimony, the district court held two evidentiary hearings, received briefs, and entertained oral argument. The court then ruled that, as to all four conversations with P and two of C's "hunches," the Company had not established entitlement to privileged communication protection. The court upheld the attorney-client privilege plea on one matter: C's St. Paul restaurant conversation with a Company senior executive. D.D.C. Memorandum and Order, J.A. 1–11.

The Company maintains in this appeal that the attorney-client privilege shields all matters addressed in the government's motion to compel; the government seeks reversal of the district court's order as to the one matter on which it did not prevail.

## II. DISCUSSION

### A. *Appealability*

█ It is the main rule that an order in an ongoing proceeding compelling testimony or documentary production is not immediately appealable; to obtain instant appellate review, the party to whom the command is addressed must refuse to respond and submit to a contempt citation. *Cobbledick v. United States*, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940); *Alexander v. United States*, 201 U.S. 117, 26 S.Ct. 356, 50 L.Ed. 686 (1906); *National Super Spuds, Inc. v. New York Mercantile Exchange*, 591 F.2d 174 (2d Cir.1979); *United States v. Anderson*, 464 F.2d 1390 (D.C. Cir.1972).[4] In *Perlman v. United States*, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950

---

**2.** C commenced working for the Company in 1973 as an engineering aide and thereafter served as a construction administrator. J.A. 13, 21. Upon his graduation from law school in 1976, he was appointed to the newly-established position of corporate counsel. J.A. 24–25. C was named vice president and general counsel in 1977. J.A. 30–31. In addition to his work as the Company's counsel, C had certain managerial functions, including direct responsibility for the contract bidding of the Company's non-union subsidiaries. J.A. 80–81.

**3.** The government asked C to disclose his hunches and opinions on a variety of matters.

The district court's order, however, is confined to two specific hunches. J.A. 10; *see infra* pp. 100–101.

C repeatedly declined to state his opinions, asserting that the Company's current counsel had instructed him not to "speculate." *See, e.g.,* J.A. 70–71. At least twice, however, C asserted the attorney-client privilege in response to questions concerning his "judgment." J.A. 155 (purpose of P's calls from an airport in Houston); J.A. 179–80 (whether the Company had engaged in numerous conspiracies to violate the antitrust laws).

**4.** *But see infra* note 6.

(1918), the Supreme Court indicated an exception to the main rule; the Company in this case dominantly relies on the *Perlman* exception.

In *Perlman*, a United States Attorney obtained a court order for the production before a grand jury of exhibits deposited with a district court clerk in prior litigation. Perlman alleged that the deposited materials belonged to him and moved to block their presentation to the grand jury. He asserted that government use of the exhibits would violate his rights under the Fourth and Fifth Amendments. The court clerk had no interest in resisting production and could not be expected to stand in contempt to aid Perlman. The district court denied Perlman's motion. The Supreme Court declared that ruling immediately appealable. Absent instant review, the Court said, Perlman would be "powerless to avert the mischief of the order." 247 U.S. at 13, 38 S.Ct. at 419.[5]

Following High Court instruction, *see United States v. Ryan*, 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971), we have confined the *Perlman* exception to situations in which the contempt route to instant appellate review is unavailable. *In re Sealed Cases*, 655 F.2d 1298 (D.C.Cir. 1981).[6] That is the situation here. C stated under oath that if the district court ordered his testimony he would not stand in contempt to permit an immediate appeal from the district court's ruling. J.A. 347. The government acknowledges that this is the atypical case in which "the circum-

stances make it unlikely that a former attorney will stand in contempt." Brief for the Government at 16 n. 12. C is no longer in the Company's employ; he has no work product to protect; he is not likely to view the Company as an object of his continuing devotion.[7]

"[I]t is not our prerogative to enlarge the [*Perlman*] exception," *In re Sealed Cases*, 655 F.2d at 1302, but neither are we positioned to declare its demise. *See National Super Spuds*, 591 F.2d at 179. Because it is at least "unlikely that [C] would risk a contempt citation in order to allow immediate review of [the Company's] claim of privilege," *United States v. Nixon*, 418 U.S. 683, 691, 94 S.Ct. 3090, 3099, 41 L.Ed.2d 1039 (1974), we hold this case within the limited class to which *Perlman* applies, and therefore turn to the attorney-client privilege issues tendered for review.

## B. *Merits*

■ We set out initially, as did the district court and the parties, the concise summary of the attorney-client privilege composed by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950):

The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer;

---

**5.** Perlman lost on the merits. The Court rejected his Fourth and Fifth Amendment arguments.

**6.** We recognized in *In re Sealed Cases* that the circuits' views are not uniform on this issue. 655 F.2d at 1302. *Compare In re Grand Jury Subpoena Dated September 15, 1983 (Marc Rich & Co.)*, 731 F.2d 1032 at 1036 n. 3 (2d Cir.1984) (order compelling attorney to produce documents claimed to be privileged held immediately appealable without inquiry into attorney's willingness to stand in contempt), *and In re Grand Jury Proceedings (Gordon)*, 722 F.2d 303, 306–07 (6th Cir.1983) (appealable; outcome should not depend on attorney's willingness to stand in contempt), *with In re Grand Jury Proceedings (Vargas)*, 723 F.2d 1461, 1465–66 (10th Cir.1983) (not appealable; attorney expected to

risk contempt). *See also In re Grand Jury (C. Schmidt & Sons, Inc.)*, 619 F.2d 1022 (3d Cir. 1980) (employer may immediately appeal order directing employees to appear before grand jury).

**7.** The government urges that the Company "may obtain full and appropriate appellate review in the event that it is convicted with the use of this testimony or its fruits." Brief for the Government at 17. The purpose of the attorney-client privilege, however, is to protect the client's confidences. *Cf. Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981) (privilege serves to encourage full disclosure by clients to their attorneys). As the Company observes, "once the cat is out of the bag, it cannot be put back in." Reply Brief at 8.

(3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

To this we append two additional black letter statements. Communications from attorney to client are shielded if they rest on confidential information obtained from the client. *Mead Data Central, Inc. v. United States Department of Air Force,* 566 F.2d 242, 254 (D.C.Cir.1977). Correlatively, "when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged." *Brinton v. Department of State,* 636 F.2d 600, 604 (D.C.Cir.1980) (footnote omitted), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).

In practice, however, advice does not spring from lawyers' heads as Athena did from the brow of Zeus. Inevitably, attorneys' opinions reflect an accumulation of education and experience in the law and the large society law serves. In a given case, advice prompted by the client's disclosures may be further and inseparably informed by other knowledge and encounters. We have therefore stated that the privilege cloaks a communication from attorney to client " 'based, *in part at least,* upon a confidential communication [to the lawyer] from [the client].' " *Brinton,* 636 F.2d at 604 (emphasis added) (footnote omitted) (quoting *8 in 1 Pet Products, Inc. v. Swift & Co.,* 218 F.Supp. 253, 253 (S.D.N.Y. 1963)).

■ It remains the claimant's burden, however, to present to the court sufficient facts to establish the privilege; the claimant must demonstrate with reasonable certainty, *Federal Trade Commission v. TRW, Inc.,* 628 F.2d 207, 213 (D.C.Cir. 1980), that the lawyer's communication rested in significant and inseparable part

on the client's confidential disclosure. *Brinton,* 636 F.2d at 603–04; *Mead Data Central,* 566 F.2d at 254.

■ We note one further general consideration. The lawyer whose testimony the government seeks in this case served as in-house attorney. That status alone does not dilute the privilege. *United Shoe Machinery Corp.,* 89 F.Supp. at 360; *see Upjohn Co. v. United States,* 449 U.S. 383, 394–95, 101 S.Ct. 677, 685, 66 L.Ed.2d 584 (1981); *United States v. AT & T,* 86 F.R.D. 603, 615 (D.D.C.1979). We are mindful, however, that C was a Company vice president, and had certain responsibilities outside the lawyer's sphere. The Company can shelter C's advice only upon a clear showing that C gave it in a professional legal capacity. *See S.E.C. v. Gulf & Western Industries, Inc.,* 518 F.Supp. 675, 683 (D.D.C.1981).

We next explain our rulings on each of the alleged confidential communications.

1. *The conversation between C and P in which C reported what he overheard at the O'Hare Hilton*

The district court ordered C to testify regarding a discussion in which C disclosed to P the contents of a conversation C had overheard at the O'Hare Hilton between executives of two of the Company's competitors. The Company claims no privilege for the contents of the overheard conversation. Brief for the Company at 12. Indeed, C has already told the grand jury what he overheard. J.A. 94–96; 149–51. The Company contends, however, that related portions of the discussion between C and P rested, in part at least, on confidential Company information. Brief for the Company at 12.

■ The record does not support the Company's position. At the hearing on the motion to compel, C stated that in giving advice to P on this matter (1) he did not rely on information from any source other than the O'Hare Hilton meeting, J.A. 253,[8]

---

**8.** The conversation C overheard was unrelated to the subject of the O'Hare Hilton conference.

and (2) P did not disclose any confidential information to him, J.A. 246. These statements settle the question. The Company points to other statements indicating that C and P believed their exchange was confidential. J.A. 218–22. Their expectation as to confidentiality, however, hardly demonstrates that confidential information gained from the client underpinned the conversation. The Company, in short, has not sustained its burden. *See Brinton,* 636 F.2d at 604; *TRW,* 628 F.2d at 213; *Mead Data Central,* 566 F.2d at 254. We affirm the district court's ruling.[9]

### 2. C's "hunches" concerning certain Company activities

The district court directed C to answer questions about:

1. His "hunch" or opinion of the identity of the person with whom [P] met in the United Air Lines Red Carpet Room at O'Hare International Airport in Chicago on or about April 3, 1978;

2. His "hunch" or opinion concerning whether there was an agreement among the bidders for the contracts to supply ... construction services and equipment to the owners of the [X facility] and the [Y facility], both bid on or about [month and day], 1980.

D.D.C. Order, J.A. 10. Seizing on broader language appearing in the district court's Memorandum, J.A. 5, the Company argues that the "hunch" testimony would divulge confidential Company information and, to the extent not supported by facts or personal knowledge, would amount to speculation in which the Company's former lawyer ought not be heard to indulge. Brief for the Company at 40–45.

We rule precisely and only on the directions expressed in the district court's

order. C no doubt has hunches that would implicate confidential Company disclosures, J.A. 252–53, and could speculate on many matters involving the Company. *See, e.g.,* J.A. 235. But the district court's order is riveted to hunches gleaned from C's direct observations at public places.

As to the first "hunch," C has already testified that he observed the president of one of the Company's competitors walking down the United Air Lines concourse some distance behind P as P returned from a meeting P earlier told C he had with "someone" in the Red Carpet Room. J.A. 107–11. As to the second, C similarly testified that he observed P making hurried calls from a public phone booth at Hobby Airport in Houston on the morning of the day projects X and Y were bid. J.A. 61–65.

█ A grand jury can act on information from a wide variety of sources, *United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974), including tips and rumors, *United States v. Dionisio,* 410 U.S. 1, 15, 93 S.Ct. 764, 772, 35 L.Ed.2d 67 (1973) (citing *Branzburg v. Hayes,* 408 U.S. 665, 701, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972)), even speculation, *Matter of Special February 1975 Grand Jury,* 565 F.2d 407, 411 (7th Cir. 1977) (citing *In re Stolar,* 397 F.Supp. 520 (S.D.N.Y.1975)). With this precedent in view, we affirm the "hunch" directions in the district court's order. C may be asked, and must respond to inquiries, about opinions formed from *direct observations* C made at O'Hare and Hobby Airports, coupled with other *non-confidential information* C may possess, concerning the identity of the person trailing P at O'Hare and bid rigging on the two named projects.

J.A. 94–96, 218–22, 246. C also reported to P on the topic discussed at the conference. However, the portion of the discussion between C and P concerning what C overheard, which the district court held not privileged, was distinct and segregable. *See* J.A. 246–47.

**9.** The district court thought the privilege inapplicable in part because C initiated the conversation and was not schooled in antitrust matters.

D.D.C. Memorandum, J.A. 7–8. We do not agree that these are privilege-stripping factors. A sheltered communication on one occasion may originate with the lawyer based on confidential disclosures the client made on an earlier occasion. A client does not lose protection for disclosures in special subject areas made to lawyers who are generalists.

3. *The conversation between C and a Company senior executive at a St. Paul restaurant*

■ Based on the evidence submitted, the district court properly concluded that the senior executive C met at a St. Paul restaurant sought C's legal advice, J.A. 118, 391–92, and that all of C's dealings with this executive involved Company legal matters, not non-law related Company operations. J.A. 173–74. The record also supports the district court's determinations that the matters discussed concerned confidential Company information and were treated accordingly (no one else was at the restaurant table and the executive was not speaking loudly enough to be overheard). J.A. 171–74. We find no tenable basis to upset the district court's ruling that this conversation was privileged.[10]

4. *Two conversations between C and P in the course of meetings to review the Company's legal affairs*

The district court held the privilege inapplicable to portions of two legal affairs conversations in P's office. In support of its ruling, the court found that: (1) the conversations took place *after* two regular legal status review meetings between C and P; (2) they were initiated by C; (3) P was not seeking legal advice; (4) C was acting as a corporate executive, not as a lawyer; and (5) the advice was not based on confidential information. D.D.C. Memorandum, J.A. 6–7.

■ Mindful that FED.R.CIV.P. 52(a) secures the district court's findings of fact against reversal on appeal unless they are "clearly erroneous," we nevertheless conclude "on the entire evidence" that the district court erred. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see Case v. Morrisette*, 475 F.2d 1300, 1306–08 (D.C.Cir.1973). The record shows that C, in his capacity as general counsel, met with P on these occasions to give P status reports on the Company's legal affairs. *See* J.A. 104–05, 223–25. *In the course of these meetings,* C raised concerns about the Company's antitrust compliance; there is no evidence in the record to substantiate the finding that the antitrust discussion took place after or apart from the regular meetings. *See* J.A. 103–06, 222–25, 248–64. Although the advice was unsolicited and P did not disclose confidential information to C at those meetings, J.A. 248, C rendered legal advice, J.A. 225, 248, 263–64, based, at least in part, on Company confidential information previously disclosed to him by management personnel generally, J.A. 254, and by the St. Paul senior executive specifically. J.A. 255–56. Under these circumstances, the conversations qualify for the privilege. *See Brinton*, 636 F.2d at 604; *United Shoe Machinery Corp.*, 89 F.Supp. at 358–59.[11]

■ Although the record supports the district court's finding that C initiated the conversations, that factor alone does not strip a communication of its privileged status. *See supra* note 9; *cf. Upjohn*, 449 U.S. at 390, 101 S.Ct. at 683 (privilege protects both lawyer's professional advice to client and client's disclosure of confidential information to lawyer to enable lawyer

---

**10.** The government does not challenge the district court's findings. Brief for the Government at 46. Instead, it urges that the conversation was in furtherance of crime, and therefore not privileged. *Id.* Our review of the record satisfies us that there is no warrant here for invoking the crime-fraud exception. *See Clark v. United States*, 289 U.S. 1, 15–16, 53 S.Ct. 465, 469, 470, 77 L.Ed. 993 (1933). We note particularly C's testimony indicating that the discussion concerned the Company's past, not its ongoing or future, conduct. J.A. 172, 174.

We also reject the government's contention that the district court should have questioned C

on this conversation *in camera, ex parte.* The district court acted within its discretion in refusing to accede to the government's request. *See Halkin v. Helms*, 598 F.2d 1, 5 (D.C.Cir.1978) (procedure "to be invoked cautiously"); *cf. Center for Auto Safety v. Environmental Protection Agency*, 731 F.2d 16, 20–22 (D.C.Cir.1984) (*in camera* inspection in FOIA cases left to district court's broad discretion).

**11.** Additionally, we find insufficient basis in the record to support any contention that the conversations were in furtherance of a crime. *See* J.A. 260–62; *supra* note 10.

to give advice); *Mead Data Central*, 566 F.2d at 254 n. 25 (privilege includes communications from attorney to client).

In summary, our review of the full record on this point leaves us "with the definite and firm conviction that a mistake has been made." *United States Gypsum*, 333 U.S. at 395, 68 S.Ct. at 542. We therefore reverse the district court's order with respect to these conversations.

### 5. *The conversation between C and P aboard an airplane*

We also reverse the district court's rejection of the attorney-client privilege to shield the conversation between C and P during their flight from Chicago to Omaha on or about April 3, 1978. The district court's ruling rests on findings that P did not expressly request C to keep the conversation confidential and that the "circumstances" were inconsistent with an intention to preserve confidentiality. D.D.C. Memorandum, J.A. 5–6. The district court also stated that it seemed "rather incongruous" that confidential information would be discussed in the course of a commercial flight.[12]

 As the district court itself later recognized, D.D.C. Memorandum, J.A. 8, an express request for confidentiality is not required. 8 WIGMORE ON EVIDENCE § 2311, at 600 (McNaughton rev. ed. 1961); *cf. United States v. AT & T*, 86 F.R.D. at 624 (absence of specific request for legal advice does not preclude application of privilege). Our review of the "circumstances," moreover, reveals no comprehensible basis for the district court's position. C and P were seated next to each other in the first-class section of the aircraft. J.A. 129, 136.

There were no other parties to their conversation. J.A. 337. Although C could not recall whether other people were seated nearby, J.A. 136, C did testify that he and P were talking in "tones" not likely to be overheard. J.A. 337.[13] He also testified that it was implicit from their relationship as president and general counsel that C should keep P's disclosures confidential at all times. J.A. 138.

The conversation itself dealt almost entirely with an analysis of legal claims that might arise in connection with an upcoming construction project. J.A. 134, 337–40. From the context of the conversation, it was apparent that P sought C's professional advice. J.A. 130–31, 140–41. C had worked as an attorney on this matter before the conversation and again after the flight. J.A. 339–40. In this work, C relied on company confidential information furnished to him prior to the conversation, J.A. 340, and he additionally used factual information P provided during the conversation. *Id.*[14]

In view of all relevant portions of the record, we conclude that the Company has sustained its burden to show that the privilege applies to this conversation. *See United Shoe Machinery Corp.*, 89 F.Supp. at 358–59. We reverse as without foundation in the record or the governing law the segment of the district court's order requiring C to answer questions about the legal claims discussion held in the first-class compartment. *See United States Gypsum*, 333 U.S. at 395, 68 S.Ct. at 542.

### III. CONCLUSION

For the foregoing reasons, the district court's order is affirmed with regard to C's

---

**12.** To the extent the district court might have gone beyond the facts before it and announced a general view on the confidentiality *vel non* of communications aboard a commercial airliner, we are not bound by Rule 52(a)'s stricture. *See Bose Corp. v. Consumers Union*, — U.S. —, 104 S.Ct. 1949, 1955, 80 L.Ed.2d 502 (1984) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982) and *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982)).

**13.** C and P did not whisper. J.A. 136. Nor did P make other overt attempts to safeguard the conversation. *Id.* But there is no evidence that the discussion was overheard by anyone either passing or seated nearby.

**14.** C also testified that P did not ask him for advice concerning ways in which P might conceal a crime. J.A. 139–40.

"hunches," his conversation with a Company senior executive in St. Paul, and his conversation with P about what he overheard at the O'Hare Hilton. It is reversed as to C's conversations with P regarding the Company's antitrust compliance and his conversation with P on the airplane.

*It is so ordered.*