26 A.3d 955

**Roger Mandel GREENBERG**

v.

**STATE of Maryland.**

**No. 144, Sept. Term, 2010.**

Court of Appeals of Maryland.

Aug. 17, 2011.

Sarah M. Miller, Assigned Public Defender, Washington, DC (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Appellant.

Daniel J. Jawor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

Appellant, Roger Mandel Greenberg, seeks reversal of his convictions in the Circuit Court for Montgomery County, arguing that the trial judge erred in permitting Greenberg's former lawyer, Mark Hessel, to testify as a part of the State's case-in-chief without conducting a preliminary inquiry regarding the "surrounding facts and circumstances" of Mr. Hessel's representation of Greenberg, the "complete circumstances related to [Greenberg's] possible waiver of privilege," and "the scope of the prosecution's proposed use of the evidence at trial."

Greenberg raised the following issue in his brief in the Court of Special Appeals:

Did the Circuit Court commit prejudicial error in admitting the testimony of appellant's former civil attorney in violation of the attorney-client privilege when it erroneously held that appellant categorically waived attorney-client privilege at trial by testifying in an earlier annulment proceeding about communications with his attorney and by failing to object to the attorney's testimony at the same proceeding?

While the appeal was pending, we granted certiorari, *Greenberg v. State*, 418 Md. 397, 15 A.3d 298 (2011), on our own initiative. Before us, the State responds, asserting the following question as relevant:

To the extent preserved, should this Court affirm Greenberg's convictions either because the crime-fraud exception to the attorney-client privilege made the challenged testimony admissible or because any error in the trial court's waiver rulings was harmless beyond a reasonable doubt?

Greenberg was indicted and tried before a jury in Montgomery County on five counts [1] related to the care of Evelyn

---

1. The indictment charged Greenberg with the following violations:
   COUNT ONE: *Financial Exploitation of Vulnerable Adult*
   **Roger Greenberg**, on or about and between November 1, 2007 through December 9, 2008, in Montgomery County, Maryland, did knowingly and willfully obtain by deception and intimidations and undue influence the property of Evelyn Zucker, a person **Roger**

Zucker, to whom Greenberg had been married. After the marriage, on November 26, 2008, but prior to Greenberg's indictment, in July of 2009, Robert M. McCarthy was appointed as guardian for Ms. Zucker. Thereafter, Mr. McCarthy initiated proceedings seeking to annul Greenberg's marriage to Ms. Zucker, void a deed prepared by Mr. Hessel that conveyed a tenancy by the entireties interest in Ms. Zucker's home to Greenberg, invalidate a will (prepared for Ms. Zucker

---

**Greenberg**, knew or should have known is a vulnerable adult, with the intent to deprive Evelyn Zucker of said property, to wit: U.S. currency in the amount of $112,829.00, in violation of Section 8–801 of the Criminal Law Article. . . .

COUNT TWO: *Embezzlement–Fraudulent Misappropriation by Fiduciary*

**Roger Greenberg**, on or about and between November 1, 2007 through December 9, 2008, in Montgomery County, Maryland, did, while acting in the capacity of a fiduciary, fraudulently and willfully appropriate U.S. currency in the amount of $112,829.00 to a use and purpose contrary to the requirements of his trust responsibilities for and on behalf of Evelyn Zucker, in violation of Section 7–113 of the Criminal Law Article. . . .

COUNT THREE: *Theft–Scheme Over $500*

**Roger Greenberg**, on or about and between November 1, 2007 through December 9, 2008, in Montgomery County, Maryland, did steal U.S. currency in the amount of $112,829.00, the property of Evelyn Zucker, having the value of more than $500, the thefts being committed pursuant to one scheme and continuing course of conduct, in violation of Section 7–108 of the Criminal Law Article. . . .

COUNT FOUR: *Abuse or Neglect of a Vulnerable Adult in the First Degree*

**Roger Greenberg**, on or about and between June 1, 2007 through December 9, 2008, in Montgomery County, Maryland, did, while being a caregiver and household member and family member and person who has permanent and temporary care and custody and responsibility for the supervision of Evelyn Zucker, a vulnerable adult, did cause abuse and neglect to Evelyn Zucker that caused serious physical injury, in violation of Section 3–604 of the Criminal Law Article. . . .

COUNT FIVE: *Abuse or Neglect of a Vulnerable Adult in the Second Degree*

**Roger Greenberg**, on or about and between June 1, 2007 through December 9, 2008, in Montgomery County, Maryland, did, while being a caregiver and household member and family member and person who has permanent and temporary care and custody and responsibility for the supervision of Evelyn Zucker, a vulnerable adult, did cause abuse and neglect to Evelyn Zucker, in violation of Section 3–605 of the Criminal Law Article. . . .

and drafted by Mr. Hessel), which would benefit Greenberg, and to remove Greenberg as Ms. Zucker's healthcare agent. During the annulment hearing, Mr. McCarthy called Greenberg and Mr. Hessel as witnesses.

During the subsequent criminal proceeding against Greenberg, the State sought to call Mr. Hessel as a witness in its case-in-chief. Greenberg's attorney moved to exclude Mr. Hessel's testimony on the basis of attorney-client privilege, asserting that Mr. Hessel "was at one point in 2008 representing both ... Ms. Zucker and Mr. Greenberg" and that there was "certainly the issue of attorney-client privilege." Whether this invocation was sufficient to trigger the need for the Circuit Court to conduct an exploration is the first impediment raised by the State,[2] based upon our comment in footnote seven of *Newman v. State,* 384 Md. 285, 863 A.2d 321 (2004) that, "the party seeking the protection of the [attorney-client] privilege bears the burden of establishing its existence," and that, "[o]nce the privilege is invoked, the trial court should 'make a preliminary inquiry and hear testimony relative thereto out of the presence of the jury, looking at the surrounding facts and circumstances.'" *Id.* at 313 n. 7, 863 A.2d at 337 n. 7 (citations omitted).

The embodiment of the common law attorney-client privilege is contained in Section 9–108 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl.

---

2. The State initially has questioned whether Greenberg properly preserved the issues of the existence and scope of attorney-client privilege, asserting that Greenberg's counsel "first broached the attorney-client privilege on the second day of trial." Greenberg sufficiently preserved this issue, because he raised the issue of attorney-client privilege at the outset of trial, stating that "inasmuch as [Mr. Hessel] was [Greenberg's] lawyer, there's certainly the issue of attorney-client privilege, which only Mr. Greenberg could waive, and he is not choosing to waive that privilege," as well as at the time Mr. Hessel was called. Greenberg's counsel also requested a continuing objection to the questioning of Mr. Hessel, which the trial judge granted, adding "I'm satisfied that [Greenberg has] clearly stated the basis" of his "objection on the record." Under these circumstances, we believe Greenberg has sufficiently preserved the issues underlying this case for our review.

Vol.), which succinctly provides that "[a] person may not be compelled to testify in violation of the attorney-client privilege." The privilege operates as a "rule of evidence [to] preven[t] the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice." *Newman,* 384 Md. at 302, 863 A.2d at 330 (citations omitted).

In *Newman,* we explored the deep historical roots of the attorney-client privilege:

> The Supreme Court has recognized the attorney-client privilege as "the oldest of the privileges for confidential communications known to the common law."
>
> The attorney-client privilege dates back in the common law to the reign of Elizabeth I (1558–1603) and probably originated in the compulsion of witnesses to testify.

*Id.* at 300–301, 863 A.2d at 330, quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981). Even before Elizabeth I's reign, the "notion that the loyalty owed by the lawyer to his client" operated to disable the lawyer as "a witness in his client's case [was] deep-rooted in Roman law," a notion which may have greatly influenced English common law. Kenneth S. Broun, McCormick on Evidence § 87, at 386–87 (6th ed. 2006).

In *Newman,* we also pointed out that, initially, the attorney-client privilege was a right held solely by the attorney, not the client, as a "point of honor." 384 Md. at 301, 863 A.2d at 330 ("Until 1776, it was not deemed to be a right of the client but rather was that of the attorney as a point of honor as an element of professional behavior."). In 1776, however, the ideology underlying the privilege underwent a dramatic shift when the House of Lords compelled an attorney to testify in the Duchess of Kingston's trial, despite the fact that the attorney raised the point of honor, effectively ending it:

> In that year, "the House of Lords in the Duchess of Kingston's Trial (20 Howell, State Trials 355, 386 (1776)) ruled that her attorney, whom she had exempted from secrecy, was required to respond to questions about his

conversations with her some three decades earlier, even though the attorney had demurred, raising the point of honor." This development ended the use of the "point of honor."

*Id.* at 301, 863 A.2d at 330 (citations omitted). Thereafter, the attorney-client privilege was conceived as one held by the client:

> During the latter half of the eighteenth century another theory evolved which recognized that the client held a privilege which prohibited the disclosure of client secrets by the attorney, rather than simply permitting the attorney to keep "the client's confidences as a professional prerogative." This theory rose to the forefront as the "point of honor" receded and soon was in use throughout the United States.

*Id.* (citations omitted). Indeed, at least as far back as 1862, we have characterized the attorney-client privilege as one protecting confidential communications between a client and his or her lawyer that "shall not be disclosed, unless by the consent of the client for whose protection the rule was established." *Fulton v. Maccracken,* 18 Md. 528, 543 (1862).

We have also explained that, though not given "express constitutional protection," the attorney-client privilege is "essential" to the "exercise of constitutional guarantees":

> The attorney-client privilege is basic to a relation of trust and confidence that, though not given express constitutional security, is nonetheless essentially interrelated with the specific constitutional guarantees of the individual's right to counsel and immunity from self-incrimination.... The essential policy of the privilege is grounded in the subjective consideration of the client's freedom from apprehension in consulting his legal advisor, assured by removing the risk of disclosure by the attorney even at the hands of the law.... [T]he freedom of confidential communication between lawyer and client is [p]erhaps as valuable as the privilege against self-incrimination.

*Harrison v. State,* 276 Md. 122, 133–34, 345 A.2d 830, 837 (1975) (citations omitted) (internal quotations omitted). The

privilege, however, is not impregnable and must be strictly construed to protect "only those attorney-client communications pertaining to legal assistance and made with the intention of confidentiality." *Newman,* 384 Md. at 302, 863 A.2d at 331, quoting *E.I. du Pont de Nemours v. Forma–Pack,* 351 Md. 396, 415–16, 718 A.2d 1129, 1138 (1998). A client may waive the privilege, whether intentionally or unintentionally, if the client's "conduct touches a certain point of disclosure" when "fairness requires" the privilege to cease. *Parler & Wobber v. Miles & Stockbridge,* 359 Md. 671, 692, 756 A.2d 526, 537 (2000); 6 McLain, Maryland Evidence State and Federal § 503:15, at 63 (West Group, Second ed. 2001) ("Waiver may be effected by the client's testifying to a significant part of the privileged confidential information."). The proposition, stated plainly, is that "what a client chooses to tell the world, he cannot later prevent his attorney from telling the court." *Agnew v. State,* 51 Md.App. 614, 651, 446 A.2d 425, 445 (1982).

In the case before us, at the outset of trial,[3] out of the presence of the jury, Greenberg's lawyer made a motion *in limine* to exclude the testimony of Mr. Hessel, proffering that Mr. Hessel had represented both Greenberg and Ms. Zucker in a legal capacity when the events underlying the instant case took place:

> [GREENBERG'S COUNSEL]: [O]n the State's Attorney's witness list is a gentleman whose name is Mark Hessel. Mark Hessel is a lawyer in Montgomery County.
>
> [COURT]: I know that.
>
> [GREENBERG'S COUNSEL]: He was at one point in 2008 representing both, I think both Ms. Zucker and Mr.

---

**3.** The State has contended that Greenberg's counsel did not sufficiently "broach" the issue of attorney-client privilege at the outset of trial. To the contrary, Greenberg's counsel moved to exclude Mr. Hessel's testimony at the outset of trial specifying that "inasmuch as [Mr. Hessel] was Mr. Greenberg's lawyer, there's certainly the issue of attorney-client privilege, which only Mr. Greenberg could waive, and he is not choosing to waive that privilege." The docket entry indicates that "defendant's oral motion in limine as to the testimony of Mr. Mark [Hessel]—denied."

Greenberg. And I think the State is intending to call [Mr. Hessel] as a witness in their case. He's on their witness list. And inasmuch as he was Mr. Greenberg's lawyer, there's certainly the issue of attorney-client privilege, which only Mr. Greenberg could waive, and he is not choosing to waive that privilege. And so therefore, I'm not certain that the State can in fact call Mr. Hessel as a witness or what they believe he is going to testify to that would be admissible evidence if there's evidence outside of the privilege that they're trying to admit. . . . I'd like to hear what the State thinks is admissible.

Later during trial, when the State called Mr. Hessel to the witness stand, Greenberg objected, claiming that there had been an attorney-client relationship between Mr. Hessel and Greenberg, and that the "things that they discussed" or "talked about" with each other were privileged.

Since our brief reference to invocation of the attorney-client privilege in *Newman,* we have not had occasion to discuss its quantum nor quality. Few of our sister states also have *directly* considered the issue of what threshold showing is necessary, although the Supreme Court of Illinois has opined that the privilege is properly invoked, presumptively, if the proponent shows that "there [was] an attorney-client relationship in which an attorney and client have communicated in a professional capacity." *In re Marriage of Decker,* 153 Ill.2d 298, 180 Ill.Dec. 17, 606 N.E.2d 1094, 1109 (1992). In *In re Marriage of Decker,* an appeal arising from a child custody and visitation dispute, a mother filed a motion to compel the father's attorney to "disclose information concerning [the father's] whereabouts," and certain other details. *Id.* at 1097. The father's attorney asserted the attorney-client privilege, explaining that, as the father's attorney, the mother's motion was "very broad in its scope" so as to necessitate a violation of the attorney-client privilege. *Id.* at 1098. The trial judge determined that the attorney-client privilege was not invoked with sufficient specificity, but the appellate court reversed, concluding that "when there is an attorney-client relationship in which an attorney and client have communicated in a

professional capacity," then "there is a rebuttable presumption that their communication is privileged." *Id.* at 1108–1109.

Various of the federal courts also have considered the attorney-client privilege presumptively invoked upon a showing that an attorney and a client communicated in a professional capacity. In *Steiner v. United States,* 134 F.2d 931 (5th Cir.1943), for example, the Court of Appeals for the Fifth Circuit determined that the attorney-client privilege was invoked upon a proffer that a witnesses's testimony was "based on [a] statement[ ] made to [the proponent] by [his former lawyer] at a time when the relationship of attorney and client existed" and that the statement was "privileged and inadmissible." *Id.* at 934.

In *In re Grand Jury Subpoena: Under Seal,* 415 F.3d 333 (4th Cir.2005), the Court of Appeals for the Fourth Circuit similarly determined the attorney-client privilege was invoked once the proponent showed "that he is a client or that he affirmatively sought to become a client." *Id.* at 339. In *In re Grand Jury Subpoena,* America Online's legal team interviewed several of America Online's employees as a part of an ongoing internal investigation. Shortly thereafter, a grand jury issued a subpoena demanding any "written memoranda and other written records reflecting interviews conducted" by the investigating attorneys. *Id.* at 337. Several of America Online's employees asserted that information obtained from the interviews were protected by the attorney-client privilege, a claim the district court rejected. The Fourth Circuit agreed, opining that privilege may be invoked only where a "finding that the [proponent's] subjective belief" an attorney-client relationship existed would be "minimally reasonable." *Id.* at 339. The employees unsuccessfully invoked the privilege, the court reasoned, because there was no reasonable indicia that they had "ever sought personal legal advice" from the investigating attorneys, that the investigating attorneys ever "rendered personal legal advice" to the employees, that the investigating attorneys ever "told the [employees] that they represented them," or "that the [employees] asked the [investigating attorneys] to represent them." *Id.*

██   In the case before us, Greenberg's proffer of the privilege was more than mere speculation that Greenberg was a client of Mr. Hessel. Greenberg's counsel advised the court that Mr. Hessel was "at one point in 2008 representing" Ms. Zucker and Mr. Greenberg, and that "inasmuch as [Mr. Hessel] was Mr. Greenberg's lawyer, there's certainly the issue of attorney-client privilege." Later in the trial, Greenberg's counsel again informed the court that Greenberg had been involved in an attorney-client relationship with Mr. Hessel, and that the "things that they discussed" or "talked about" with each other were privileged. As a result, the attorney-client privilege was sufficiently invoked to trigger further proceedings.

Whether what was done to explore the nature and extent of the privilege and any commensurate waiver is the next question. Our opinion in *Newman*, again in footnote seven, explored what type of inquiry is appropriate:

> Once the privilege is invoked, the trial court should "make a preliminary inquiry and hear testimony relative thereto out of the presence of the jury, looking at the surrounding facts and circumstances." In this preliminary inquiry, the trial court will decide as a matter of law whether the elements of the privilege are present and if so, whether the communication, absent an exception, is privileged. This threshold question must be determined without requiring the disclosure of the communication at issue.

*Id.* at 313 n. 7, 863 A.2d at 337 n. 7 (citations omitted). Greenberg has asserted that, once he invoked the privilege, the judge should have inquired, through an evidentiary hearing or through proffers, into the "surrounding facts and circumstances" of Mr. Hessel's representation of Greenberg, the "complete circumstances related to [Greenberg's] possible waiver of privilege," and "the scope of the prosecution's proposed use of the evidence at trial." The State has responded that, because the parties' privilege arguments were made in "broad strokes," "trial tactics," and not trial error, were to blame for the lack of a more detailed preliminary inquiry.

When the attorney-client privilege was invoked, the judge heard a proffer from the State that "[Greenberg] already testified in a hearing for the annulment procedure annulling the marriage between [Ms. Zucker] and [Greenberg] about the relationship that he had with [Mr. Hessel]." The judge then heard legal argument on waiver and reviewed a transcript of Greenberg's testimony at the annulment hearing before ruling that Greenberg "waived the privilege when he testified at a judicial hearing regarding the very matters that he now seeks to stand behind the attorney-client privilege."

■ The process by which privilege is determined is governed by Maryland Rule 5–104(a),[4] which requires a preliminary determination, but *not* an evidentiary hearing:

(a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination, the court may, in the interest of justice, decline to require strict application of the rules of evidence, except those relating to privilege and competency of witnesses.

(b) **Relevance conditioned on fact.** When the relevance of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction

---

4. We adopted Maryland Rule 5–104 in 1993, modeling it substantially upon Federal Rule of Evidence 104(a). *Newman*, 384 Md. at 313 n. 7, 863 A.2d at 337 n. 7. Federal Rule 104 states, in pertinent part:

(a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) **Relevancy conditioned on fact.** When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Fed.R.Evid. 104(a)-(b). Thus, federal decisions bearing on Federal Rule of Evidence 104(a) are persuasive. *Perry v. State*, 381 Md. 138, 145–146, 848 A.2d 631, 635 (2004).

of evidence sufficient to support a finding by the trier of fact that the condition has been fulfilled.

Maryland Rule 5–104(a)–(b). We have instructed that the "party seeking the protection of the privilege" ultimately "bears the burden of establishing its existence." *E.I. du Pont de Nemours*, 351 Md. at 415, 718 A.2d at 1138; *In re Criminal Investigation 1/242Q*, 326 Md. 1, 11, 602 A.2d 1220, 1225 (1992).

In *Harrison*, 276 Md. at 122, 345 A.2d at 830, we adopted Wigmore's test for deciphering the existence and scope of an attorney-client privilege:

> (1) Where legal advice of [any] kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected, (7) from disclosure by himself or by the legal adviser, (8) except the protection [may] be waived.

*Id.* at 135, 345 A.2d at 838, quoting 8 Wigmore on Evidence § 2292, at 554 (McNaughton rev. ed. 1961). These essential elements of the attorney-client privilege are the subject of the preliminary inquiry identified in *Newman* about which the trial court must make its determination.

Obviously, an evidentiary hearing is not required under Maryland Rule 5–104, but what appears to be required by courts, at least on the federal level, addressing attorney-client privilege, are findings to satisfy not only the existence, but the non-existence and waiver of the attorney-client privilege. In *In re Sealed Case*, 737 F.2d 94, 97 (D.C.Cir.1984), for example, the General Counsel of a company testified before the grand jury and was asked about certain conversations and "hunches" the attorney had, including private conversations with the company president aboard a commercial aircraft. The General Counsel invoked the attorney-client privilege. After conducting a preliminary inquiry, the federal district court ruled that the attorney-client privilege did not exist, based upon the court's opinion that, "it seemed 'rather incongruous' that confidential information would be discussed in the course of a

commercial flight." *Id.* at 102. The Court of Appeals for the District of Columbia Circuit reversed, reasoning, in part, that the district court's finding as to the confidentiality element of attorney-client privilege was "without foundation in the record." *Id.*

Further, in *United States v. Schwimmer,* 892 F.2d 237 (2d Cir.1989), the Court of Appeals for the Second Circuit had occasion to consider the effect of a district court judge's failure to make findings as to the essential elements of the attorney-client privilege. Once the privilege was invoked, the trial judge reviewed a transcript of the allegedly privileged grand jury testimony, and summarily concluded that the privilege did not apply, stating that any privileged information was "negligible." *Id.* at 245. The Second Circuit remanded for more "detailed findings," concluding that "the record [was] insufficient to support the perfunctory findings of the district court with respect to the privilege issue." *Id.* at 239. Later, after detailed findings were made by the district court on remand, the appellate court affirmed, reasoning that no "violative use of privileged information had occurred." *United States v. Schwimmer,* 924 F.2d 443, 447 (2d Cir.1991), *cert. denied Schwimmer v. United States,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991).

In the case before us, Greenberg's counsel proffered that Mr. Hessel's testimony implicated confidential attorney-client communications and that Greenberg was "not choosing to waive" his privilege. In response, the State proffered that Mr. Hessel's testimony involved "acts" and not "communications," and that Greenberg waived the privilege when he and Mr. Hessel testified at the annulment hearing, all of which was reiterated two days into trial. Although the judge did review the transcript of Greenberg's testimony at the annulment hearing prior to the time that he determined waiver, he did not determine the nature and scope of privileged communication, nor did he explore with specificity what testimony the State sought to solicit from Mr. Hessel, as well as utilize those details to determine the extent of any waiver.

We do know from the record now what the State sought to elicit from Mr. Hessel, although the information comes only from an opening statement given after waiver of the privilege was determined by the court; the State stated:

> [STATE'S ATTORNEY]: You will then hear testimony that Roger Greenberg in early December hires a lawyer and asks him, Mark Hessel, to draft a *deed* that will make Roger Greenberg the recipient of Evelyn Zucker's house upon her death. And it will also allow him to avoid a transfer *tax* of $11,000. You'll hear that Mark Hessel in the early days of December also is hired by Roger Greenberg to drive Roger and Evelyn to various banks to check on the amounts in her *bank accounts,* to lift various restrictions that would allow him to access her money, and to get debit cards in his name.
>
> You'll also hear, ladies and gentlemen, that on the day, the very day that she is discovered by adult protective services, the attorney, the same attorney who was hired by Roger Greenberg gets Evelyn Zucker to sign a *power of attorney* and a document that will allow Roger Greenberg to make medical decisions for [Ms. Zucker].

These assertions, however, regarding the nature and extent of the communication between Greenberg and Mr. Hessel that the State sought to plumb, were not known to the trial court when it determined waiver and did not come close to being commensurate with what was disclosed by Greenberg at the annulment hearing, nor did Greenberg's annulment hearing testimony serve as a foundation for the trial testimony of Mr. Hessel, as shown below:

| Greenberg<br>*Annulment Hearing* | Mr. Hessel<br>*Trial* |
|---|---|
| ***THE DEED*** | |
| Q: [D]id you contact Mr. Hessel first? Or did Ms. Zucker contact Mr. Hessel first? | Q: [W]ere there any other details he gave you at that time about what he wanted to do in terms of the deed? |
| A: I contacted, I believe it was me that contacted him. Now, I | A: [I]nitially, I spoke with Mr. Greenberg on the phone and |

remember what happened. Okay. We wanted to put the house in both our names.

then he came to my office. At one of those two times *he told me that, that someone wanted to give him her house.*

## TAX CONSEQUENCES OF MARRIAGE

Q: [S]o Mr. Hessel told you it would be about $11,000 in taxes to put your name on the deed?

A: [I]t's really foggy in my brain, which I'm not going to, yeah, I don't remember.

\* \* \*

Q: [Did] Mr. Hessel [tell] you [that] if you were married there would be no tax, no transfer tax (unintelligible) your wife?

A: It's a possibility.

Q: [Y]ou told him that if he was not married that there would be $11,000 in taxes, is that correct?

A: Not exactly.... I asked him what the value of the property was and he told me, I think, roughly a half a million dollars. And I said that the transferred record agent taxes would be about $11,000.

\* \* \*

He later told me that they were [married] and showed me the marriage certificate.

\* \* \*

I told him that it was $11,000. He said, "Would that still be the case if the two people are married and not unmarried?" And I said, "Yes. If they're married, the transfer and record agent taxes are waived."

## MS. ZUCKER'S BANK ACCOUNTS

Q: Why would you hire Mr. Hessel?

A: Why would we hire him? We needed him.

Q: Why?

Q: [D]id there come a point in time in early December where you were contacted by Roger to set up an appointment to check on some bank accounts?

A: I don't know how to handle these financial things, financial affairs that was going on, the annuity checks that were coming in. I don't know how to handle these things. He needed to find out everything that was going on and straighten the mess out.

A: Yes.... After Roger had given me the deed, he said, "And my wife has this other issue that maybe you can help us with." He said that her sister had died, that the attorney handling the estate they didn't trust. They weren't able to get access to her bank accounts and they were afraid that the attorney was stealing from her. And the banks weren't giving them information about the accounts.

## *HEALTHCARE AGENT/POWER OF ATTORNEY*

Q: Did you know you were [Ms. Zucker's] attorney in fact and her healthcare agent prior to today?

A: I think I did.

Q: Did there come a point in time ... when that business was conducted that you then visited the Sleep Inn again?

\* \* \*

A: I had said, you know, "You're recently married. Generally, married couples will have power of attorney and appointment of healthcare agent for each other." Appointment of healthcare agent, it's kind of like a medical power of attorney. And I suggested that would be appropriate for me to draft that.

Q: Did there come a point in time where you did actually draft those documents?

A: Yes. I believe I did it Monday evening or early Tuesday and I brought them with me on Tuesday so that we could execute those documents before we went to Citibank in Silver Spring.

What the trial court had before it with respect to Greenberg's testimony at the annulment hearing was not sufficient to be able to determine the nature and extent of the attorney-client privilege, nor its waiver. The judge's premature determination of waiver cannot be affirmed on this sparse

record and precludes any ability to determine whether any other exception to the privilege existed, such as the crime-fraud exception.

The State, nevertheless, asserts that we should conclude that any error was harmless. We may declare a trial error harmless only where, on an independent review of the record, we are "able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Bellamy v. State*, 403 Md. 308, 332, 941 A.2d 1107, 1121 (2008), quoting *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976). In the case before us, Mr. Hessel's testimony was an important part of the State's introductory statement to the jury and discussed in closing. Mr. Hessel testified not only about the benefit that Greenberg would receive under the newly drafted will, but also the lengths to which Greenberg went to determine the extent of Ms. Zucker's assets. Mr. Hessel's testimony coupled with the State's references to it in opening and closing can in no way be viewed as harmless.

As a result, due to the error in the determination of the waiver of the attorney-client privilege, we reverse and remand for a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED AND CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY MONTGOMERY COUNTY.**